*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:   December 1, 2016                    106479
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                         Respondent,
          v                                    MEMORANDUM AND ORDER

GARY L. WAITE,
                         Appellant.
_____

Calendar Date:   October 13, 2016

Before:   Garry, J.P., Egan Jr., Rose, Devine and Mulvey, JJ.

_____

        David M. Abbatoy Jr., Rochester, for appellant.

        Kathleen B. Hogan, District Attorney, Lake George (Emilee
B. Davenport of counsel), for respondent.

_____

Garry, J.P.

        Appeal from a judgment of the County Court of Warren County
(Hall Jr., J.), rendered December 12, 2013, upon a verdict
convicting defendant of the crimes of murder in the second
degree, manslaughter in the second degree and endangering the
welfare of a child.

        Defendant's 15-month-old child sustained fatal head
injuries while he was in defendant's exclusive care.  Defendant
was thereafter charged with murder in the second degree,
manslaughter in the second degree and endangering the welfare of
a child.  In March 2012, the People moved to disqualify
defendant's two retained attorneys due to a conflict of interest.
One of the attorneys withdrew and, following a hearing, County
Court disqualified the second attorney with defendant's consent.

Thereafter, defendant's new attorney advised the court that he had previously represented the child's mother.  At a hearing, the mother testified that she had shared information with this counsel that she considered to be secret.  Counsel objected to disqualification, and defendant stated that he was willing to waive the potential conflict of interest, but the court nevertheless deemed counsel to be disqualified and assigned a fourth attorney to represent defendant.  Thereafter, the court granted defendant's motion to dismiss the charge of murder in the second degree on the ground that there was insufficient evidence to establish depraved indifference.  Upon the People's appeal, this Court reversed and reinstated the charge (108 AD3d 985, 987 [2013]).  Following a jury trial, defendant was convicted as charged and sentenced to an aggregate prison term of 25 years to life.  Defendant appeals.

Defendant contends that the evidence of indifference and recklessness was legally insufficient to support his conviction for depraved indifference murder.  As for indifference, the People were required to show that defendant's mens rea when the crime occurred was one of "an utter disregard for the value of human life — a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not" (People v Suarez, 6 NY3d 202, 214 [2005]; see People v Feingold, 7 NY3d 288, 296 [2006]).  The People established at trial that defendant was alone with the child from approximately 11:00 a.m. to 6:00 p.m., at which point his sister arrived, found the child unresponsive and directed defendant to call 911.  Defendant initially told police that the child had fallen off a couch and cut his lip between 2:00 p.m. and 3:00 p.m., that he called a friend who often helped him care for the child for advice, and that she told him not to seek medical assistance yet and to keep the child awake.  After the child fell, according to defendant, he played with a stuffed animal and later watched television while seated in a chair, getting up a few times to come over to defendant.

Defendant told police that shortly before 6:00 p.m., the child stood up, fell forward and hit his face on a metal chair. He stated that the child was bleeding and gasping for air, and his eyes were rolling back in his head.  Defendant called the

friend and his mother to tell them that the child was "hurt bad," and they dispatched his sister to his home. He stated that he did not call for medical assistance because "[he] was panicking and [emergency personnel] wouldn't have understood [him]."

Later that evening, defendant amended his statement, acknowledging that he had not previously told the police the full truth. He stated that the child cried for 20 or 30 minutes after the initial fall from the couch. When the child "wouldn't stop bugging out," defendant became frustrated and "tossed" him to the other end of the couch; the child bounced off and his head hit the hardwood floor. According to defendant, the child then "mellowed out" and "looked tired and not like [he] usually act[ed]." In a separate conversation that same evening, defendant told an emergency room nurse that the child "wasn't acting right" after he fell out of a chair, and that he heard the child "make a weird noise and was moving weird." The nurse testified that, based upon defendant's description and demonstration, she identified the strange sound as agonal breathing and the unusual movements as posturing, both of which were signs of severe brain injury.

The uncontradicted testimony of the People's medical witnesses challenged the credibility of defendant's explanations for the child's catastrophic head injuries, which included a fractured skull, a subdural hematoma and severe swelling of the brain. The treating emergency room physician, the medical examiner and a pediatric neurosurgeon opined that these injuries could not have resulted from falling or bouncing off a couch or chair. Instead, such injuries were caused by significant force, such as that of a car crash or a fall from an upper story; the emergency room physician testified that he had seen comparably severe injuries caused, in one case, by an elevator that fell on a child's head and, in another, by a collapsing gravestone. The medical testimony further called into question defendant's claim that the child was able to play, watch television, stand up and walk after the initial injury. The physicians opined that the child probably never regained consciousness; if he did so briefly, he would have been in severe pain and would quickly have become unresponsive and then comatose. The medical examiner testified that the child's increasing lethargy and

unresponsiveness — caused by the swelling of his brain as time passed — would have been "very obvious" to an average layperson. He further testified that several injuries on the child's face, arms and legs — which included facial bruises consistent with being punched in the eye, other bruises on his face and upper thighs, a bruise on his arm consistent with being grabbed, and a facial laceration that would have required sutures if he had survived — had occurred contemporaneously but could not all have resulted from a single blow. The neurosurgeon testified that the time interval between the infliction of these injuries and the arrival of medical assistance could have been up to three hours.

This evidence was supplemented by the testimony of two neighbors who heard a loud banging sound in defendant's apartment that afternoon. One neighbor, who lived below defendant's apartment, said that the sound was so loud that it frightened his children. The other neighbor, who was outside, stated that he heard a loud bang as if "someone was carrying a couch and dropped it on a wooden floor" followed by a scream like "a terrifying kid in anguish" that was not a child's normal cry. Thereafter, he heard more bangs, interrupted by crying and screaming that indicated to him that a child "was being hurt." After a total of seven or eight bangs, the child made no more sounds.

Taken as a whole, the jury could rationally have concluded that defendant brutally assaulted the child because he did not stop crying after the initial, relatively minor fall from the couch. This attack occurred — by defendant's own account — sometime between approximately 2:30 p.m. and 3:30 p.m. The jury could further have concluded that defendant's failure to seek medical assistance for the child during the hours that followed — despite his admitted awareness that the child was behaving abnormally and his knowledge of "the brutal origin of the injuries and the force with which they were inflicted" — displayed the wanton, uncaring mental state that constitutes depraved indifference (People v Barboni, 21 NY3d 393, 402 [2012]; see People v Nelligan, 135 AD3d 1075, 1077-1078 [2016], lv denied 27 NY3d 1072 [2016]; People v Keegan, 133 AD3d 1313, 1316 [2015], lv denied 27 NY3d 1152 [2016]; People v Johnson, 127 AD3d 451, 451-452 [2015], lv denied 26 NY3d 1009 [2015], cert denied ___ US ___, 136 S Ct 1669 [2016]; People v Griffin, 48 AD3d 1233, 1235

[2008], lv denied 10 NY3d 840 [2008]; People v Ford, 43 AD3d 571, 573-574 [2007], lv denied 9 NY3d 1033 [2008]; see also People v Dallas, 119 AD3d 1362, 1365-1366 [2014], lv denied 24 NY3d 1083 [2014]).

Contrary to defendant's argument, the fact that he called and texted a friend several times during the afternoon for advice on caring for the injured child does not require a different conclusion. The uncontradicted evidence established that defendant dissembled the circumstances and the child's condition in these communications, failing to tell the friend that anything more serious than falling off the couch had happened to the child or that his behavior was unusual. The jury could reasonably have concluded that defendant was seeking to minimize the gravity of the child's condition rather than genuinely attempting to obtain assistance, and that his intent was to protect himself rather than the child. As we said when this case was previously before us, "a defendant who inflicts severe injuries upon a child and then attempts to weave a story over several hours to save himself while the child suffers is hardly less callously indifferent to the child's life than one who waits and eventually dispassionately reports the child's condition" (108 AD3d at 987).

Further, the fact that defendant was panic-stricken and distraught by the time he finally did summon aid does not alter the case. The People were required to show that defendant had the necessary mens rea of callous indifference when the crime occurred, not at all times thereafter. The jury could rationally have concluded that he had the requisite mental state of callous indifference during the attack and the period in which he failed to seek medical assistance or tell the truth to his friend about the child's condition, and that he did not become distraught until he realized that the grievous harm he had inflicted could not be concealed (compare People v Barboni, 21 NY3d at 402).

Defendant next contends that the severity of the child's injuries established that he acted with an intent to kill and that the People therefore failed to prove that he acted with the recklessness required for a conviction pursuant to Penal Law § 125.25 (4). As he concedes, this claim is unpreserved. Nevertheless, defendant also asserts that the verdict was against

the weight of the evidence, which requires this Court to determine whether each element of the charged crimes was proven beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 348-349 [2007]; People v Harden, 134 AD3d 1160, 1160 [2015], lv denied 27 NY3d 1133 [2016]).  Upon review, we find no merit in the claim.  The gravity of the injuries sustained by this vulnerable 15-month-old child, without more, does not establish that "[defendant] intended to cause death or serious physical injury, in the sense of having that as a conscious objective or purpose" (People v Barboni, 21 NY3d at 404).  Defendant did not use a gun or other means that inherently suggest an intent to kill (see id.), nor was there proof that he had "any motive, animosity or ill-will" that might have led him to form the purpose of killing the child (People v Bowman, 48 AD3d 178, 182 [2007], lv denied 10 NY3d 808 [2008]; accord People v Griffin, 48 AD3d 1233, 1235 [2008], lv denied 10 NY3d 840 [2008]).  We find that the verdict was not against the weight of the evidence.[1]

Finally, defendant's contention that County Court abused its discretion by disqualifying his counsel is unavailing. Initially, the record belies defendant's contention that the court failed to inform him that he could waive the conflict created by the fact that his second attorney had previously represented a potential trial witness.  Instead, the court plainly advised defendant that he could continue to be represented by this counsel if he so chose, although also noting that counsel had advised against this course of action, and that the court agreed it was unwise.  Defendant's response – that he would accept his counsel's advice and seek new representation by the Public Defender's office – clearly indicated his understanding that he had a choice.

As for the disqualification of the third attorney, "[a] criminal defendant's right to counsel of his or her choice is not

_____

[1]  We reject defendant's alternative argument that his counsel was ineffective for failing to preserve the intent issue, as failing to pursue a meritless claim does not constitute ineffective assistance (see People v Kindred, 100 AD3d 1038, 1041 [2012], lv denied 21 NY3d 913 [2013]).

absolute and may properly be circumscribed where defense counsel's continued representation of the defendant would present a conflict of interest" (People v Robinson, 121 AD3d 1179, 1180 [2014]).  When a conflict exists, a court must balance the defendant's constitutional right to the effective assistance of counsel against his or her right to be represented by the counsel of his or her choice, and the decision may be challenged on constitutional grounds no matter which alternative it selects (see People v Watson, 26 NY3d 620, 624 [2016]; People v Carncross, 14 NY3d 319, 327 [2010]; People v Gomberg, 38 NY2d 307, 312-313 [1975]).  As it is particularly difficult to predict the potential implications of a conflict of interest before a trial, a "court [is] allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses" (Wheat v US, 486 US 153, 163 [1988]).

Here, this counsel's prior representation of the child's mother was limited to a few brief communications and appearances in a child support violation proceeding.  Counsel stated that he had learned no confidential information that could affect his representation, and defendant stated that after discussing the potential conflict, he was willing to waive it.  However, the mother testified that she had shared information with counsel that she considered to be secret, and she refused to waive the confidentiality of this information or agree to counsel's representation of defendant.  She further stated that she was already uncomfortable about the prospect of testifying as a hostile witness at the trial and that counsel's continued representation of defendant would make this more difficult for her.  In light of all the circumstances, and particularly considering the unknown nature of the confidential information that the mother had provided and the concomitant difficulty of predicting its potential impact upon the trial, disqualification of this counsel was "a proper exercise of [County Court's] broad discretion" (People v Robinson, 121 AD3d at 1180; see People v Watson, 26 NY3d at 625-626; People v Carncross, 14 NY3d at 330; People v Gordon, 272 AD2d 133, 134 [2000], lv denied 95 NY2d 890 [2000]; see also People v Hall, 46 NY2d 873, 874-875 [1979], cert

denied 444 US 848 [1979]).

Egan Jr., Rose, Devine and Mulvey, JJ., concur.


ORDERED that the judgment is affirmed.




ENTER:

Robert D. Mayberger
Clerk of the Court