******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

## STATE OF CONNECTICUT *v.* BROCK DAVIS
## (SC 20335)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crime of murder in connection with the stabbing death of the victim, the defendant appealed to this court, claiming, inter alia, that the trial court had violated his constitutional right to the effective assistance of counsel by failing to conduct any inquiry into defense counsel's alleged conflict of interest arising from counsel's prior representation of the victim's son, D. On appeal, this court agreed with the defendant that the trial court had a duty to conduct such an inquiry when the issue was brought to that court's attention in a motion to dismiss counsel and during the defendant's sentencing hearing. This court also concluded, however, that the record was insufficient to determine whether the defendant's claim had merit and, therefore, remanded the case to the trial court for it to determine whether defense counsel had such a conflict and, if so, whether that conflict adversely affected her representation of the defendant. In light of that remand order, this court declined to reach the defendant's additional claim that the trial court had improperly admitted the testimony of three lay witnesses identifying the defendant in surveillance video footage from a store near the crime scene. The footage depicted, inter alia, two men, with their faces visible, approaching and entering the store together before the victim's murder. Additional footage from a different camera angle depicted the backs of two men, dressed similar to those in the other footage, making their way to, and then standing at, the intersection where the murder occurred. Subsequent footage showed one of the men attacking the other man and then running down the street toward the direction of the store. On remand, the trial court, following a hearing at which the defendant and defense counsel testified, determined that the defendant did not timely raise his conflict of interest claim and that, even if he had done so, he failed to establish that defense counsel was burdened by an actual conflict of interest that adversely affected her performance. After the case returned to this court, the defendant challenged the trial court's determination concerning counsel's alleged conflict of interest, and this court addressed the defendant's evidentiary claim. *Held*:

1. The trial court correctly concluded that defense counsel's prior representation of D did not create an actual conflict of interest that adversely affected her representation of the defendant: even if this court assumed that the defendant's conflict of interest claim was timely, there was no evidence that the defendant's and defense counsel's interests ever diverged with respect to any material factual or legal issue, or with respect to a course of action, or that counsel's representation of the defendant was otherwise impaired as a result of her loyalty to D; moreover, the trial court credited counsel's testimony that, during her representation of D, she learned nothing that she was prevented from using in her defense of the defendant and that the strategies and tactics she employed at trial were entirely unencumbered and uninfluenced by anything relating to her representation of D, and that court's factual findings, including that defense counsel's brief representation of D had no effect on the course of the defendant's trial, were not clearly erroneous; furthermore, there was no merit to the defendant's contention that an attorney's prior representation of a relative of the victim in a criminal case creates a per se conflict of interest.

2. The trial court did not abuse its discretion in admitting the testimony of three lay witnesses identifying the defendant in surveillance video footage: pursuant to the rule recently established in *State* v. *Gore* (343 Conn. 129), lay opinion testimony concerning the identification of a criminal defendant depicted in a surveillance video is admissible if, in accordance with the provision (§ 7-1) of the Code of Evidence governing the admissibility of lay opinion testimony, it is rationally based on the perception

of the witness and is helpful to a clear understanding of that witness' testimony or the determination of a fact in issue; moreover, such testimony meets the requirements of § 7-1 if, in light of the totality of the circumstances, there is some basis for concluding that the witness is more likely than the jury to correctly identify the defendant from the footage; in the present case, the totality of the circumstances favored admission of the challenged testimony, as it was undisputed that all three witnesses were sufficiently familiar with the defendant, and, although the defendant was not wearing a disguise during the commission of the murder and the record did not indicate whether the defendant's appearance had changed between the time the surveillance video footage was recorded and the time of trial, the quality of the video weighed in favor of admission of the challenged testimony, as the subject in the video was wearing a hat pulled down over his ears and a winter jacket, and, at certain angles, his face was obscured by either the dark lighting or his movements; accordingly, this court could not conclude that the witnesses, all of whom knew the defendant exceedingly well, could be of no assistance to or were no better suited than the jury in identifying the defendant in the surveillance video footage.

3. The defendant could not prevail on his claim that it would be improper for this court to apply *Gore* retroactively to this case because *Gore* was decided on the basis of policy considerations rather than on constitutional grounds: judicial decisions generally apply retroactively to pending cases, and this court's application of the rule set forth in *Gore* did not give rise to any of the concerns highlighted in *Neyland* v. *Board of Education* (195 Conn. 174), which established the test for determining whether a judicial decision should be applied prospectively only, because, although *Gore* established a new principle of law by overruling past precedent holding that the rule limiting lay opinion testimony on the ultimate issue precludes the admission of lay opinion testimony identifying a defendant in video surveillance footage when that identification embraces an ultimate issue, the defendant did not argue or demonstrate that he relied to his detriment on one legal standard over another during the events underlying this case, the underlying trial, or in bringing the present appeal, despite being afforded an opportunity to do so in the supplemental briefing ordered by this court to address the applicability of *Gore* to this case; moreover, the result in this appeal would have been the same under the pre-*Gore* rule in view of the witnesses' strong familiarity with the defendant and the fact that their testimony did not address the ultimate issue in this case insofar as the witnesses did not identify the defendant from the video surveillance footage depicting the attack but identified the defendant in footage placing him near the crime scene at or around the time of the attack.

Argued November 24, 2020—officially released July 26, 2022

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Hartford, where the court, *Dewey, J.*, denied the defendant's motion to dismiss his counsel; thereafter, the case was tried to the jury before *Gold, J.*; verdict and judgment of guilty, from which the defendant appealed to this court, which remanded the case for further proceedings; subsequently, the court, *Gold, J.*; issued a memorandum of decision, and the parties filed supplemental briefs. *Affirmed*.

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Gail P. Hardy*, former state's attorney, and *John F. Fahey*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. In *State* v. *Davis*, 338 Conn. 458, 460, 258 A.3d 633 (2021), this court agreed with the defendant, Brock Davis, that, on two separate occasions, the trial court improperly failed to inquire into whether defense counsel, Kirstin B. Coffin, had a conflict of interest.[1] We therefore remanded the case to that court for a determination of whether Coffin did, in fact, have such a conflict and, if so, whether it adversely affected her representation of the defendant. Id., 460, 475. Because a new trial would have been required if the trial court answered these two questions in the affirmative, we did not reach the defendant's additional claim that the trial court had improperly admitted into evidence testimony from lay witnesses identifying him in a surveillance video recording.[2] Id., 479. In accordance with this court's remand order, the trial court, following a hearing, determined that the defendant had failed to establish that Coffin was burdened by an actual conflict of interest that adversely affected her performance. On appeal, the defendant challenges that determination. We reject this claim, and, because we also reject the defendant's remaining claim, we affirm the judgment of the trial court.

The defendant was convicted of murder in connection with the stabbing death of the victim, Joseph Lindsey, on December 9, 2015, in Hartford. Id., 460–61. Following his conviction, the defendant was sentenced to a term of incarceration of fifty years. Id., 460. On appeal to this court, the defendant claimed, inter alia, that the trial court had violated his right to the effective assistance of counsel by failing to conduct any inquiry into Coffin's alleged conflict of interest when the issue was twice brought to the court's attention—first in a motion to dismiss counsel, which the defendant filed as a self-represented party on May 24, 2017,[3] and again during the defendant's sentencing hearing on June 5, 2019.[4] Id., 460, 469. We agreed with the defendant that the trial court had a duty on both occasions to inquire into Coffin's alleged conflict of interest. Id., 469. However, because we could not determine, on the basis of the record before us, whether the defendant's conflict of interest claim had any merit, we remanded the case to the trial court for a determination of that question. Id., 475. Specifically, we instructed the trial court to conduct a hearing at which the defendant would have the burden of establishing "(1) that [Coffin] actively represented conflicting interests and (2) that an actual conflict of interest adversely affected [Coffin's] performance." (Footnote omitted; internal quotation marks omitted.) Id., 477. The court was further instructed to make findings of fact and conclusions of law in writing, to be filed with the Office of the Appellate Clerk for our review. Id., 478. We did not address the defendant's remaining claim that the trial court had improperly

admitted into evidence testimony from three lay witnesses identifying him in surveillance video footage, concluding that, if necessary, we would reach that claim when the trial court submitted its written findings to us. Id., 479.

On remand, the trial court, *Gold*, *J.*, conducted a hearing at which both the defendant and Coffin testified. The defendant testified that the conflict of interest alleged in his May 24, 2017 motion to dismiss counsel was premised on Coffin's prior representation of Tristan Durant—the son of the victim in this case—which the defendant stated he learned about during a February, 2017 meeting with Coffin at the prison where he was being held. The defendant testified that he was "shocked" to learn of Coffin's prior representation of Durant and immediately asked Coffin to recuse herself, which she declined to do. When asked why he did not raise the issue with the trial court the next time he was in court, on March 29, 2017, the defendant stated that he is "a layman" and "kind of froze up."

Coffin testified that, based on her case file notes, the prison visit in question occurred on January 9, 2018, not in February, 2017, as the defendant had stated. Coffin also testified that the issue of her prior representation of Durant arose because, a day before her meeting with the defendant, while reviewing a supplemental police report in the defendant's case, it had come to her attention that Durant was the victim's son. Upon learning of Durant's connection to the case, Coffin spoke to the trial prosecutor, who assured her that Durant, with whom the police had spoken only briefly during their investigation of the victim's murder, would not be called as a state's witness because he had nothing relevant to offer about the crime. Coffin stated that, when she met with the defendant the next day, she informed him about her prior representation of Durant. According to Coffin, the defendant "didn't have a problem with it," did not ask that she withdraw her representation, and did not mention the matter again until his sentencing hearing on June 5, 2019.

On January 3, 2022, the trial court issued a memorandum of decision in which it concluded that the defendant had failed to establish that Coffin was burdened by an actual conflict of interest as a result of her prior representation of Durant. Because a court's duty to inquire into an attorney's potential conflict of interest is triggered only when the issue is raised in a timely manner; see, e.g., *State* v. *Vega*, 259 Conn. 374, 389, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); the court began its analysis with findings related to that issue. Specifically, the court found that "Coffin's testimony regarding when she disclosed to the defendant her prior representation of . . . Durant, and how the defendant reacted to that disclosure, provide[d] the accurate account of the events that

transpired." In so finding, the court credited Coffin's testimony that the defendant had first learned of her representation of Durant during a prison visit on January 9, 2018, approximately nine months after the defendant filed his May, 2017 motion to dismiss counsel, and not in February, 2017, as the defendant claimed. The court observed that Coffin's ability to pinpoint the precise date of the disclosure was not based solely on memory but, rather, on " 'very detailed notes' " she had taken for her file. On the basis of this finding, the court determined that Coffin's representation of Durant could not have been the basis of the nondescript conflict of interest mentioned in the defendant's May, 2017 motion.
[5] The court further found that the defendant's objection to Coffin's representation of Durant at the time of his sentencing was not timely raised because, by that time, the defendant had known about Coffin's potential conflict for nearly eighteen months. In the court's view, the defendant, for strategic reasons, had "sat silent for eighteen months waiting to see how his trial would turn out" and, then, only after being convicted, brought his alleged concern regarding Coffin's representation of Durant to the court's attention.

The court further determined that, "[e]ven if it were to overlook the untimely nature of the defendant's claim and [to] consider how . . . Coffin's representation of . . . Durant may have impacted her ability to defend the defendant," it would conclude that the defendant had "failed to sustain his burden of establishing that . . . Coffin actively represented conflicting interests that adversely affected her performance." Specifically, the court credited Coffin's testimony that she had represented Durant in May, 2014, in connection with misdemeanor domestic violence charges and that her representation encompassed two court appearances during that same month, the latter of which marked the resolution of the case by plea agreement. The court also credited Coffin's testimony that she never met the victim while representing Durant and had no reason to think Durant possessed any information relevant to the defendant's case. The court further found that (1) Coffin did not acquire any information during the course of her representation of Durant that, due to her ongoing duty of loyalty to him, she was prevented from using in her defense of the defendant, (2) Coffin was told by the prosecutor that Durant would not be called as a state's witness during the defendant's trial, and (3) the strategies and tactics Coffin employed on behalf of the defendant were unencumbered and uninfluenced by anything relating to her prior representation of Durant. In sum, the court credited Coffin's testimony that she did not view her prior representation of Durant as creating any sort of conflict that would detract from her representation of the defendant. In light of these findings, the court concluded that, even if the defendant had asserted a timely objection to Coffin's alleged conflict

of interest, he failed to demonstrate that such a conflict actually existed. Additional facts and procedural history will be set forth as needed.

I

We first consider the defendant's claim that the trial court incorrectly concluded that Coffin's prior representation of Durant did not create an actual conflict of interest that adversely affected her representation of the defendant. In support of this contention, the defendant asserts that "the record clearly establishes [that] there was a conflict of interest because it is undisputed that . . . Coffin represented [Durant]." The defendant further asserts that the trial court's factual finding regarding when he first learned of Coffin's prior representation of Durant is clearly erroneous, and, therefore, the court's ultimate legal conclusion that the defendant's conflict of interest claim was not timely raised is also incorrect. We are not persuaded.

"It is axiomatic that a criminal defendant's sixth amendment right to the effective assistance of counsel includes the right to counsel that is free from conflicts of interest. . . . It is a fundamental principle . . . that an attorney owes an overarching duty of undivided loyalty to his [or her] client. At the core of the sixth amendment guarantee of effective assistance of counsel is loyalty, perhaps the most basic of counsel's duties. . . . Loyalty of a lawyer to his [or her] client's cause is the sine qua non of the [s]ixth [a]mendment's guarantee that an accused is entitled to effective assistance of counsel. . . . That guarantee affords a defendant the right to counsel's undivided loyalty." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Davis*, supra, 338 Conn. 469–70.

As we previously have explained, when a "defendant claims that his counsel was burdened by an actual conflict of interest . . . the defendant need not establish actual prejudice. . . . [When] there is an actual conflict of interest, prejudice is presumed because counsel [has] breach[ed] the duty of loyalty . . . ." (Citations omitted; internal quotation marks omitted.) *Phillips* v. *Warden*, 220 Conn. 112, 132–33, 595 A.2d 1356 (1991); see also *Cuyler* v. *Sullivan*, 446 U.S. 335, 349–50, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). "An actual conflict of interest is more than a theoretical conflict. The United States Supreme Court has cautioned that the possibility of conflict is insufficient to impugn a criminal conviction. . . . A conflict is merely a *potential* conflict of interest if the interests of the defendant may place the attorney under inconsistent duties at some time in the future. . . . To demonstrate an actual conflict of interest, the [defendant] must be able to point to *specific instances* in the record [that] suggest impairment or compromise of his interests for the benefit of another party. . . . A mere theoretical division of loyalties is not enough." (Citations omitted; emphasis in original;

internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 127 Conn. App. 538, 550, 15 A.3d 658 (2011), aff'd, 308 Conn. 456, 64 A.3d 325 (2013); see *Aguilar-Garcia* v. *United States*, 517 Fed. Appx. 880, 882 (11th Cir. 2013) ("a speculative or merely hypothetical conflict of interest does not yield a [s]ixth [a]mendment violation"); see also *United States* v. *Coscia*, 4 F.4th 454, 475 (7th Cir. 2021) ("[a]n actual conflict, for [s]ixth [a]mendment purposes, is a conflict of interest that adversely affects counsel's performance" (internal quotation marks omitted) (quoting *Mickens* v. *Taylor*, 535 U.S. 162, 172 n.5, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)), cert. denied,      U.S.     , 142 S. Ct. 1127, 212 L. Ed. 2d 17 (2022).

We are mindful that, in reviewing the defendant's claim, "the underlying historical facts found by the [trial] court may not be disturbed unless they were clearly erroneous, [but] whether those facts constituted a violation of the [defendant's] rights under the sixth amendment is a mixed determination of law and fact that requires the application of legal principles to the historical facts of [the] case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Phillips* v. *Warden*, supra, 220 Conn. 131. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 154–55, 920 A.2d 236 (2007).

In analyzing the defendant's claim, "we are [also] guided by our previous definition of an attorney's conflict of interest. We have described an attorney's conflict of interest as that which impedes his paramount duty of loyalty to his client. . . . Thus, an attorney may be considered to be laboring under an impaired duty of loyalty, and thereby be subject to conflicting interests, because of interests or factors personal to him that are inconsistent, diverse or otherwise discordant with [the interests] of his client . . . ." (Internal quotation marks omitted.) *State* v. *Parrott*, 262 Conn. 276, 287–88, 811 A.2d 705 (2003); see also *State* v. *Crespo*, 246 Conn. 665, 689–90, 718 A.2d 925 (1998), cert. denied. 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999). "Whether a conflict of interest exists depends on a number of factors, including, but not limited to, whether the attor-

ney has confidential information that is helpful to one client but harmful to another; whether and how closely the subject matter of the multiple representations is related; how close in time the multiple representations are related; and whether the prior representation has been unambiguously terminated." *United States* v. *Infante*, 404 F.3d 376, 392 (5th Cir. 2005). "This question is highly [fact sensitive]." Id; see also Rules of Professional Conduct 1.9.[6]

Applying these principles to the present case, even if we assume that the defendant's objection to Coffin's alleged conflict of interest was timely raised, we can perceive no basis for disturbing the trial court's finding that no actual conflict of interest existed. As the trial court stated, there is simply no evidence that Coffin's and the defendant's interests ever diverged with respect to any material factual or legal issue, or to a course of action, or that Coffin's representation of the defendant was otherwise impaired as a result of her loyalty to Durant. See, e.g., *Perillo* v. *Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) ("actual conflict exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client" (internal quotation marks omitted)); see also *Armienti* v. *United States*, 234 F.3d 820, 824 (2d Cir. 2000) ("[t]here is an actual conflict between lawyer and client when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action" (internal quotation marks omitted)). To the contrary, the court credited Coffin's testimony that, among other things, during her brief representation of Durant, she learned nothing that she was prevented from using in her defense of the defendant and that the strategies and tactics she employed at trial were entirely unencumbered and uninfluenced by anything relating to her representation of Durant. See, e.g., *State* v. *Martin*, 201 Conn. 74, 82, 513 A.2d 116 (1986) ("the trial court must be able, and be freely permitted, to rely [on] [defense] counsel's representation that the possibility of . . . a conflict does or does not exist" (internal quotation marks omitted)); see also *United States* v. *Flynn*, 87 F.3d 996, 1001 (8th Cir. 1996) ("[i]n determining whether a conflict of interest exists, substantial weight is given to defense counsel's representations").

In sum, the trial court held an evidentiary hearing on the defendant's conflict of interest claim and issued a thorough memorandum of decision, in which it found, inter alia, that Coffin's brief representation of Durant had no effect whatsoever on the course of the defendant's trial. The court's underlying findings were based on credibility determinations made after hearing the testimony of both Coffin and the defendant. "As a reviewing court, our role is not to speculate about coun-

sel's motives or about the plausibility of alternative litigation strategies. Our role is to defer to the [trial court's] factual findings unless we can conclude they are clearly erroneous." *Mickens* v. *Taylor*, supra, 535 U.S. 177 (Kennedy, J., concurring). Having conducted a thorough review of the record, we cannot conclude that the trial court's findings in this case were clearly erroneous.

In arguing to the contrary, the defendant cites a single case, *People* v. *Waite*, 145 App. Div. 3d 1098, 1103, 42 N.Y.S.3d 437 (2016), appeal denied, 29 N.Y.3d 953, 76 N.E.3d 1087, 54 N.Y.S.3d 384 (2017), which, he claims, stands for the proposition that "a conflict of interest [actually] exists when an attorney for a criminal defendant has previously represented a relative of the victim." We disagree that *Waite* supports the defendant's argument. Before explaining why, however, we note that, to the extent the defendant purports to argue that an attorney's prior representation of a relative of the victim in a criminal case creates a per se conflict of interest, we reject that contention. Indeed, "[t]he [United States] Supreme Court has . . . recognized a per se conflict of interest in only one circumstance—whe[n] defense counsel is forced to represent codefendants over [counsel's] timely objection . . . and has declined to extend the per se rule to other potential conflicts . . . ." (Citations omitted; internal quotation marks omitted.) *Cardoza* v. *Rock*, 731 F.3d 169, 183 n.8 (2d Cir. 2013), quoting *Mickens* v. *Taylor*, supra, 535 U.S. 168. The United States Court of Appeals for the Second Circuit, however, has applied a per se exclusionary rule in an additional context—"when an attorney is implicated in the crimes of his or her client because the attorney cannot be free from fear that a vigorous defense should lead the prosecutor or the trial judge to discover evidence of the attorney's own wrongdoing." (Internal quotation marks omitted.) *Cardoza* v. *Rock*, supra, 183, quoting *United States* v. *Fulton*, 5 F.3d 605, 611 (2d Cir. 1993). In all other cases, however, including those in which defense counsel previously represented the victim; see e.g., *Mickens* v. *Taylor*, supra, 164–65; or previously represented a witness in a case; see, e.g., *United States* v. *Iorizzo*, 786 F.2d 52, 57–58 (2d Cir. 1986); the defendant must demonstrate that an actual conflict existed—i.e., one that "compelled [defense counsel] to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client." *Perillo* v. *Johnson*, supra, 205 F.3d 781. The trial court found, and we agree, that the defendant failed to shoulder his burden in this case.

Contrary to the defendant's assertions, *Waite* does not support, much less compel, a different conclusion. In *Waite*, the issue before the court was whether the trial court abused its discretion in disqualifying defense counsel because he previously had represented the vic-

tim's mother, who "testified that she had shared information with [him] that she considered to be secret, and she refused to waive the confidentiality of this information or [to] agree to counsel's representation of [the] defendant. She further stated that she was already uncomfortable about the prospect of testifying as a hostile witness at the trial and that counsel's continued representation of [the] defendant would make this more difficult for her." *People* v. *Waite*, supra, 145 App. Div. 3d 1103–1104. In light of these circumstances, "and particularly considering the unknown nature of the confidential information that the mother had provided and the concomitant difficulty of predicting its potential impact [on] the trial," the Appellate Division of the New York Supreme Court concluded that the trial court's decision to disqualify defense counsel was a proper exercise of that court's authority. Id., 1104. In the present case, however, unlike in *Waite*, the trial court found that Durant was not involved in the defendant's trial, had no information relevant to the defendant's case, and was not called as a state's witness in the case. To the extent *Waite* has any relevance at all to the present case, then, it is simply to illustrate the fact sensitive nature of the court's inquiry when a potential conflict of interest is brought to its attention.

## II

We next address the defendant's claim that the trial court improperly admitted into evidence testimony from three lay witnesses identifying him in a surveillance video recording. In their principal briefs to this court, the parties framed their analysis of this issue around *State* v. *Finan*, 275 Conn. 60, 881 A.2d 187 (2005), which held that the ultimate issue rule set forth in § 7-3 of the Connecticut Code of Evidence[7] precludes the admission of lay opinion testimony identifying a defendant in video surveillance footage when that identification embraces an ultimate issue in the case. Id., 66–67. After issuing the remand order in the present case, this court decided *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022), and *State* v. *Bruny*, 342 Conn. 169, 269 A.3d 38 (2022). In *Gore*, we overruled *Finan* and "amended § 7-3 (a) of the Connecticut Code of Evidence to incorporate an exception to the ultimate issue rule for lay opinion testimony that relates to the identification of criminal defendants or other persons depicted in surveillance video or photographs." *State* v. *Bruny*, supra, 181. In so doing, we held that "[l]ay opinion testimony identifying a person in surveillance video or photographs is admissible if that testimony meets the requirements of § 7-1 of the Connecticut Code of Evidence.[8] That is, such testimony is admissible if the opinion is 'rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue.' Conn. Code Evid. § 7-1." (Footnote added.) *State* v. *Bruny*, supra, 181. In light of these recent decisions,

we ordered the parties to submit supplemental briefs, addressing the issue of whether, under *Gore* and *Bruny*, "the trial court improperly admit[ted] into evidence the testimony of [the] three lay witnesses identifying the defendant in a surveillance video . . . ." In his supplemental brief, the defendant argues that, despite the recent change in the law, "it was harmful error to admit the lay witness testimony identifying [him] in a surveillance video when the only issue at trial was the identity of the perpetrator." The state, on the other hand, argues that the trial court properly admitted the testimony under the rule established in *Gore* and *Bruny*. We agree with the state.

The following additional facts are relevant to our resolution of this issue. Following the victim's murder, investigating officers learned that a liquor store near the crime scene was equipped with a video surveillance system that may have recorded events surrounding the murder. Tyshawn Welborn, the owner of the store, provided the police with a flash drive containing the relevant footage.[9] The footage encompassed five different camera views, designated as channels one, two, three, four, and eight, and captured footage from the immediate front of the liquor store, inside of the liquor store, and a larger view of the corner of Baltimore Street and Albany Avenue, where the murder occurred. The footage depicts, in relevant part, two men—one wearing a beige jacket, blue jeans, and a dark knit cap, and the other wearing a black sweatshirt and blue jeans—together, with their faces visible, approaching and entering the liquor store approximately thirty minutes before the victim's murder. Additional footage, from a different camera angle, depicts the backs of two men—dressed similarly to those in the other footage—as they make their way to, and then stand at, the intersection of Albany Avenue and Baltimore Street.[10] After several minutes, the man in the beige jacket appears to attack the man in the black sweatshirt, and, subsequently, the man in the beige jacket is shown running down Albany Avenue, toward the direction of the liquor store.

Prior to trial, the defendant filed a motion in limine to exclude the testimony of three witnesses, Robin Jackson, Everton Osbourne, and Danette Musa, whom the state intended to call to identify the defendant from the liquor store surveillance video footage. Relying on § 7-3 of the Connecticut Code of Evidence and *Finan*, the defendant argued that the court should preclude the testimony of these witnesses on the ground that they lacked a sufficient level of familiarity with him and because their testimony "would be an opinion of fact on an ultimate issue [in the case] . . . ."

A hearing was held on the defendant's motion during which the state adduced the testimony of the three witnesses. Jackson testified that, although he had known the defendant since before 2006, the two men

had grown particularly close after they were incarcerated together at Enfield Correctional Institution in 2006. Jackson described the defendant as a "good friend" whom he saw nearly every day. Osbourne similarly testified that, at the time of the victim's murder, he had known the defendant for approximately six years and that he saw him in the neighborhood "[j]ust about every day . . . ." Musa, who was an employee of the liquor store, testified that she had known the defendant since the store first opened five or six months before the murder and that the defendant and the victim came into the store together nearly every day.

During the hearing, the state argued that *Finan* was distinguishable from the present case and, therefore, not controlling because, in that case, the witnesses— four police officers—"were asked to view [a] video of the actual incident and they didn't identify the defendant by his face," but, rather, they identified him by other characteristics such as a "unique walk he had . . . ." The state also argued that the Appellate Court's decisions in *State* v. *Felder*, 99 Conn. App. 18, 912 A.2d 1054 (overruled in part by *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022)), cert. denied, 281 Conn. 921, 918 A.2d 273 (2007), and *State* v. *Holley*, 160 Conn. App. 578, 127 A.3d 221 (2015) (overruled in part by *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022)), rev'd on other grounds, 327 Conn. 576, 175 A.3d 514 (2018), supported admission of the testimony because those decisions clarified that, if there is a sufficient relationship between the witness and the defendant or individual pictured in the surveillance footage, "it becomes a fact rather than an opinion that they're testifying to," and, in the present case, the three witnesses had "fairly significant" familiarity with the defendant so as to render their testimony fact testimony rather than improper opinion testimony. The court agreed with the state and denied the defendant's motion in limine.

The case proceeded to trial, at which the state presented the surveillance video footage through the testimony of Welborn, who testified as to the different camera angles, explaining that channel one showed the front of the liquor store door facing outward toward Albany Avenue, channel two showed the front of the store on the right side, channel three showed the interior left side and left aisle of the store, channel four showed the counter located at the back of the store, and channel eight showed the outside of the store looking left toward the corner of Baltimore Street and Albany Avenue. During their respective testimony, Jackson, Osbourne, and Musa were shown clips of the original surveillance video footage and were asked to identify the two men depicted therein. Each witness identified the defendant as the man in the beige jacket and blue jeans, and the victim as the man in the black sweatshirt and blue jeans. With this background in mind, we turn to our analysis of the defendant's claim.

As we explained, this court recently held that lay opinion testimony identifying a defendant via surveillance video footage is no longer inadmissible so long as it meets the requirements of § 7-1 of the Connecticut Code of Evidence, namely, that "the opinion is 'rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue.' " *State* v. *Gore*, supra, 342 Conn. 148, quoting Conn. Code Evid. § 7-1. We further held that, in order to satisfy the "helpful" requirement of § 7-1, such testimony is admissible only "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury." (Internal quotation marks omitted.) *State* v. *Gore*, supra, 150. In making that determination, we directed our courts to apply the totality of the circumstances test utilized by the federal courts when evaluating whether a jury is just as capable of identifying a defendant from video footage as a witness, which requires consideration of four factors: (1) "the witness' general level of familiarity with the defendant's appearance"; (2) "the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken"; (3) "a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or the subject's use of a disguise in the surveillance footage"; and (4) "the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage." Id., 151.

In the present case, the defendant does not dispute that Jackson, Osbourne, and Musa were sufficiently familiar with him that the first two factors support the trial court's decision to admit their testimony. The defendant focuses his argument, rather, on the third and fourth factors, arguing that the witnesses were no more likely to correctly identify him than was the jury because (1) there was no evidence that he changed his appearance prior to trial or that he wore a disguise during the commission of the offense, and (2) the surveillance video was clear and in color with "no blurriness or graininess." We are not persuaded.

Although the record does not reflect whether the defendant's appearance changed between the time the surveillance video footage was recorded and the time of trial, we agree with the defendant that the third factor favors his position in that he is clearly not wearing a disguise in the video. We disagree, however, that the fourth factor also weighs in his favor. Contrary to the defendant's assertion, we conclude that the video is "[neither] so unmistakably clear [nor] so hopelessly obscure that the witness[es] [were] no [better suited] than the jury to make the identification." (Internal quotation marks omitted.) *State* v. *Bruny*, supra, 342 Conn.

185. In the video, the defendant is wearing a black hat pulled down over his ears and a winter jacket, and, at certain angles, his face is obscured due to either the dark lighting or his movements. Given these facts, we cannot say that the witnesses, all of whom knew the defendant exceedingly well, could be of no assistance to or were no better suited than the jury in making the identification. See, e.g., *United States* v. *Jackman*, 48 F.3d 1, 5 (1st Cir. 1995) (when surveillance photographs of robber, who was wearing bulky winter jacket and baseball cap, were somewhat blurred and showed only part of robber's face, identification of defendant by lay witnesses did not constitute abuse of discretion because identification conceivably was of help to jury); see also *United States* v. *Allen*, 787 F.2d 933, 936 (4th Cir. 1986) (when photographs used for identification were less than clear and depicted individual with blurred profile, hardhat on, and most of left half of his face hidden, identification of defendant by lay witnesses was "especially helpful" to jury), vacated on other grounds, 479 U.S. 1077, 107 S. Ct. 1271, 94 L. Ed. 2d 132 (1987). As we noted in *Gore*, because the test for evaluating whether a witness, rather than the jury, is more likely to correctly identify the defendant from a photograph or video is a totality of the circumstances test, "the failure to satisfy [a] single factor to support admitting the testimony is not fatal. That weakness may be highlighted during cross-examination and in closing argument." *State* v. *Gore*, supra, 342 Conn. 165 n.19. Accordingly, because the totality of relevant circumstances indisputably favors admission of the challenged testimony in this case, we conclude that the trial court did not abuse its discretion in allowing the witnesses to testify.

We note, finally, that, in his supplemental brief, the defendant argues that it would be improper for us to apply *Gore* retroactively to his case "because that decision was based on policy considerations and not constitutional grounds." In support of this argument, he cites *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996) for the proposition that we may never apply a rule retroactively when that rule is based on policy considerations rather than on constitutional grounds.[11] We disagree. We previously have explained that, as a general rule, "judicial decisions apply retroactively to pending cases . . . ." (Citation omitted.) *Campos* v. *Coleman*, 319 Conn. 36, 62, 123 A.3d 854 (2015). However, "[i]n *Neyland* v. *Board of Education* [195 Conn. 174, 179, 487 A.2d 181 (1985)], we discussed the [three part] test set out in *Chevron Oil Co.* v. *Huson*, 404 U.S. 97, 92 S. Ct. 349, 30 L. Ed. 2d 296 (1971), for determining whether a decision must be applied prospectively only. A common-law decision will be applied nonretroactively only if: (1) it establishes a new principle of law, either by overruling past precedent on which litigants have relied . . . or by deciding an issue of first impression whose

resolution was not clearly foreshadowed . . . (2) given its prior history, purpose and effect, retrospective application of the rule would [impede] its operation; and (3) retroactive application would produce substantial inequitable results, injustice, or hardship." (Internal quotation marks omitted.) *In re Daniel N.*, 323 Conn. 640, 652 n.7, 150 A.3d 657 (2016); see also *State* v. *Snelgrove*, 288 Conn. 742, 758 n.8, 954 A.2d 165 (2008) ("[j]udgments rendered in decisions that are not limited by their terms to prospective application in other cases usually are applied retroactively to other cases pending at the time" (internal quotation marks omitted)).

Moreover, it is axiomatic that "[t]he issue of retroactivity of decisional law is a question of policy to be decided by [this court], and may be decided by the policy consideration of whether litigants could be deemed to have relied on past precedent or whether the new resolution of an old issue was foreshadowed, or whether equity, given the particular facts, requires a prospective application only." (Internal quotation marks omitted.) *Fortin* v. *Hartford Underwriters Ins. Co.*, 139 Conn. App. 826, 836 n.4, 59 A.3d 247, cert. granted, 308 Conn. 905, 61 A.3d 1098 (2013) (appeal withdrawn November 26, 2014). In the present case, it is unpersuasive to suggest that this court's present application of the standard set forth in *Gore* gives rise to any of the concerns set forth in the preceding paragraph. That is, although *Gore* does establish a new principle of law by overruling past precedent, the defendant has not argued, let alone demonstrated, that he relied to his detriment on one legal standard over another during the events underlying this case, the underlying trial, or in bringing the present appeal; see id.; despite being afforded an opportunity to do so in the supplemental briefing ordered by this court to address the applicability of *Gore* to this case.[12]

We recognize, however, as the defendant argues, that, were it not for the "unusual procedural posture of this case"—namely, the fact that we agreed with the defendant's claim regarding the trial court's failure to adequately inquire into Coffin's alleged conflict of interest and, therefore, remanded the case to the trial court for a determination of that issue—his case would have been decided under *Finan* and its progeny, which were still good law at the time of his original appeal. It is clear, however, that the result would be the same even under *Finan*.

In *Finan*, this court held that the testimony of four police officers identifying the defendant as one of two persons depicted in video footage of a convenience store robbery violated the prohibition in § 7-3 (a) of the Connecticut Code of Evidence against the admission of opinion testimony if it embraces an ultimate issue in the case. *State* v. *Finan*, supra, 275 Conn 61–63, 67; see *State* v. *Gore,* supra, 342 Conn. 143. We reached

this conclusion because the footage depicted the robbery itself and did not capture the defendant's face. See *State* v. *Gore*, supra, 142; see also *State* v. *Finan*, supra, 62. As a result, the officers' testimony was "limited to their suspicions that the defendant was depicted on the [video]"; *State* v. *Finan*, supra, 63; based on "details such as the defendant's profile, his mannerisms and his distinctive walk." *State* v. *Gore*, supra, 142; see also *State* v. *Finan*, supra, 63. Because the officers' testimony in *Finan* was clearly opinion testimony regarding the ultimate issue in the case—whether it was the defendant or someone else in the video robbing the store—this court had no reason to distinguish between fact and opinion testimony. See *State* v. *Gore*, supra, 143.

Post-*Finan* decisions by our Appellate Court, including *State* v. *Felder*, supra, 99 Conn. App. 18, and *State* v. *Holley*, supra, 160 Conn. App. 578, however, did draw such a distinction in applying *Finan* and concluded that when, as in the present case, witnesses have a high level of familiarity with the defendant, their identification of him from a video or photograph is not a matter of opinion, as it was in *Finan*, but rather one of fact.

As we explained in *Gore*: "Both the *Felder* and *Holley* decisions relied on the witness' level of familiarity with the defendant to distinguish between factual recognition and mere opinion.

"In *Holley*, the defendant was convicted of numerous crimes, including felony murder, in connection with a home invasion. . . . At trial, the state presented testimony from Nicole Clark, a coworker of the defendant, who identified him on video surveillance footage taken on a bus he rode home with his coconspirator after committing the crimes. . . . The Appellate Court concluded that Clark's testimony that she recognized the defendant's face in the still photographs from the footage is not characterized accurately as *opinion* testimony as to whether the photograph depicted the defendant. Clark recognized the defendant's face as it appeared in the still image based on the fact of her past acquaintance with him; she did not merely offer an opinion as to whether the still image depicted the defendant. Thus, her testimony was based on the *fact* that she recognized the defendant, not on an opinion that the photograph depicted him. . . .

"In *Felder*, the defendant was convicted of robbery in the first degree and larceny in the third degree in connection with a bank robbery. . . . At trial, his girlfriend and former roommate, Michelle Mills, testified that she recognized him in photographs taken from the bank surveillance video. . . . Mills testified that her recognition of the defendant was based on his head covering, sneakers, nose and posture. . . . On appeal, the defendant relied on this court's decision in *Finan* to argue that Mills' testimony should have been excluded as lay opinion testimony that went to the

ultimate issue. . . . The Appellate Court rejected the defendant's claim on the ground that Mills' testimony did not constitute opinion testimony. . . . Although the court did not explain the reasoning that led it to that conclusion, in the facts section, the court specifically detailed Mills' level of familiarity with the defendant, listed the bases of her recognition, and stated that she testified that she recognized the defendant." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gore*, supra, 342 Conn. 143–45.

Based on the foregoing, in the present case, application of the *Finan* rule would lead to the same result that we have reached under the *Gore* standard. Specifically, given the witnesses' strong familiarity with the defendant—which the defendant himself does not dispute— we would be obliged to conclude that, even under *Finan*, the trial court properly admitted the challenged testimony. Moreover, the witnesses' testimony did not address, in violation of *Finan* and the pre-*Gore* version of § 7-3 of the Connecticut Code of Evidence, the ultimate issue in this case—namely, whether the defendant committed the offense—because the witnesses did not identify the defendant from the surveillance video footage depicting the assault; rather, the jury was left to conclude on its own whether, based on the totality of the state's evidence, the defendant was the individual who assaulted the victim on the corner of Baltimore Street and Albany Avenue.[13] See, e.g., *State* v. *Holley*, supra, 160 Conn. App. 618 ("[The witness'] testimony that she recognized the defendant as depicted in the photograph at issue was not tantamount to a legal opinion about his criminal culpability. The state's case rested on circumstantial evidence and [the defendant's] presence . . . on the bus . . . shortly after the victim's murder certainly was integral to the state's theory of the case and to the issue of whether the defendant was criminally liable for the several offenses at issue in the case. [His] presence on the bus, however, did not directly shed light on his conduct at the victim's residence, whether the defendant had the criminal intent related to the offenses with which he was charged, or whether he had entered into a conspiracy . . . . Thus, we do not conclude that his presence on the bus was the essence of the matters to be decided by the jury."). These two facts taken together compel the conclusion that the witnesses' testimony in the present case was properly admitted under *Finan*, its progeny, and the pre-*Gore* version of § 7-3 of the Connecticut Code of Evidence, and, thus, the result in this appeal remains the same regardless of the rule applied.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] "In cases involving potential conflicts of interest, this court has held that [t]here are two circumstances under which a trial court has a duty to inquire . . . (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a

particular conflict exists . . . . To safeguard a criminal defendant's right to the effective assistance of counsel, a trial court has an affirmative obligation to explore the possibility of conflict when such conflict is brought to the attention of the trial judge in a timely manner." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, supra, 338 Conn. 470; see also *United States* v. *Levy*, 25 F.3d 146, 153 (2d Cir. 1994) ("[w]hen a [trial] court is sufficiently apprised of even the possibility of a conflict of interest, the court . . . has an 'inquiry' obligation").

[2] We did, however, address the defendant's claim that the trial court further denied his right to the effective assistance of counsel by denying his motions to dismiss Coffin without adequately inquiring into the bases for the motions. *State* v. *Davis*, supra, 338 Conn. 460. Specifically, in his May, 2017 motion to dismiss counsel, the defendant argued that Coffin did not diligently provide him with copies of the state's discovery materials or investigate information he had provided to her; that, during a meeting with her investigator and the defendant, she allowed her investigator to recommend that he plead guilty; and that she violated unspecified professional and ethical legal standards. Id., 460, 462. We disagreed with the defendant's claim on appeal, concluding that the trial court, in the exercise of its broad discretion, adequately inquired into the bases for the defendant's motions to dismiss counsel before denying them. Id., 467–69.

[3] The defendant's May 24, 2017 motion to dismiss counsel asserted the following four reasons why Coffin should be dismissed, only one of which is relevant to this appeal: "(1) she failed to meet professional and ethical standards established by the Connecticut Bar Association and the American Bar Association, (2) she 'refused to allow [the defendant] to view any items that would enable [him] to come to an intelligent and informed decision as to where [his] best interest[s] [lie] and . . . to aid in his own defense,' (3) she failed to investigate certain information he had provided to her, and (4) '[a] conflict of interest has arisen.' " *State* v. *Davis*, supra, 338 Conn. 462; see footnote 2 of this opinion. On June 13, 2017, the trial court, *Dewey, J.*, conducted a hearing on the defendant's motion to dismiss counsel, during which the court denied the motion without making any inquiry into the defendant's claim that Coffin was laboring under a conflict of interest. Id., 462–63. The case then proceeded to trial before the court, *Gold, J.* Id., 464.

[4] "[A]t the defendant's sentencing hearing, when asked by the trial court, *Gold, J.*, whether he wished to address the court, the defendant . . . raised the issue of [Coffin's] alleged conflict of interest. Specifically, he stated that, on two prior occasions, he had attempted to dismiss [Coffin] because he did not have faith in her abilities and because she was 'representing the son of [the victim].' " *State* v. *Davis*, supra, 338 Conn. 464.

[5] The trial court was "convinced," rather, that the conflict of interest alleged in the defendant's May, 2017 motion to dismiss counsel, which the defendant had drafted as a self-represented party, was not, as the defendant now contends, a conflict of interest in the legal sense, thereby implicating the sixth amendment to the United States constitution, but, rather, a *disagreement* between the defendant and Coffin arising out of and related to other complaints that he had concerning Coffin's representation. See footnotes 2 and 3 of this opinion. In the court's view, the defendant had incorrectly used a legal term of art to describe what was, in actuality, a personal conflict between him and Coffin, entirely unrelated to her prior representation of Durant.

[6] Rule 1.9 of the Rules of Professional Conduct provides in relevant part: "(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

\*\*\*

"(c) A lawyer who has formerly represented a client in a matter . . . shall not thereafter:

"(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

"(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client."

The commentary to rule 1.9 provides in relevant part: "The scope of a 'matter' for purposes of this Rule depends on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. . . .

"Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. . . ." Rules of Professional Conduct 1.9, commentary.

[7] Section 7-3 of the Connecticut Code of Evidence provides in relevant part: "(a) General rule. Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue. . . ."

[8] Section 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue."

[9] The flash drive included two versions of the surveillance footage, both of which were played for the jury. As explained hereinafter, the three lay witnesses identified the defendant in the video labeled "original video," which had been broken down into several different clips according to the camera that was recording. Each clip lasted several minutes, and the video in its entirety was approximately twenty minutes. The second video, labeled "working copy," was the enhanced version of the original video, and this video was not shown to the lay witnesses.

[10] The two men's faces are not discernable in this footage.

[11] In *Troupe*, this court modified the constancy of accusation doctrine. See *State* v. *Troupe*, supra, 237 Conn. 287. In so doing, we "conclude[d] that the modification of the rule that we announce[d] . . . [would] apply only to those cases in which constancy of accusation testimony ha[d] not yet been admitted into evidence on the date of the publication of th[e] opinion" and emphasized that, because the decision to modify the doctrine was based solely on policy considerations rather than on constitutional grounds, and because "we have frequently given only prospective effect to changes based on policy considerations that do not carry constitutional implications . . . we [saw] no reason to order a new trial in [that] or any other case in which testimony had been properly permitted under our former version of the constancy of accusation doctrine." (Citations omitted; footnote omitted.) Id., 305–306.

[12] Moreover, as we explained in *Gore*, "trial courts have struggled to apply [the pre-*Gore* version of] § 7-3 (a) of the Connecticut Code of Evidence . . . laboring both to draw an illusory distinction between fact and opinion testimony suggested by *Finan* and its progeny, and to determine when identifications of persons in video footage or still photographs embrace an ultimate issue. [Thus] [r]ather than apply an analysis that we have determined to be grounded on artificial and illusory distinctions, we believe that the better approach is to provide the trial courts with an illustration of the application of the totality of the circumstances test that we [have] adopt[ed] . . . ." (Footnote omitted.) *State* v. *Gore*, supra, 342 Conn. 138–39. We further note that, even if we were to apply the old rule and conclude that it required reversal of the judgment, it would provide the defendant with no real benefit because, at any new trial, the rule adopted in *Gore* would apply.

[13] This fact especially makes the holding in *Finan* limited to its facts and, thus, inapplicable to the present case, as the lay witnesses in *Finan* identified the defendant in surveillance video footage depicting the robbery itself. See *State* v. *Finan*, supra, 275 Conn. 62.