# STATE OF CONNECTICUT *v*. RICHARD EVANS
## (SC 21006)

Mullins, C. J., and McDonald, D'Auria,
Ecker, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder and carrying a pistol without a permit in connection with the shooting death of the victim, the defendant appealed to this court. The defendant claimed that the trial court had improperly admitted the testimony of a lay witness, M, concerning his identification of the defendant in a photograph that was taken from surveillance video footage captured around the time of the victim's murder. The defendant also claimed that the trial court had improperly denied in part his motion to suppress certain cell site location information that the police had acquired after obtaining a search warrant for records relating to the defendant's cell phone. *Held*:

Application of the factors articulated in *State* v. *Gore* (342 Conn. 129) for assessing whether a witness is more likely than the fact finder to correctly identify an individual depicted in a surveillance video or photograph led this court to conclude that the trial court had not abused its discretion when it allowed M to testify regarding his identification of the defendant from the photograph.

Although M had encountered the defendant only once prior to identifying him from the photograph forty-three days after that encounter, the trial court appropriately considered the nature of the encounter in determining that M had more than a minimal degree of familiarity with the defendant, as M's focus during the encounter was heavily on the defendant, M had the opportunity to observe the defendant's gait and posture, M was able to view the defendant's face directly, the encounter took place during the daytime, and the defendant's face was unobstructed.

Moreover, the photograph from which M identified the defendant was taken from surveillance footage captured just four days after M had seen and spoken with the defendant, and, thus, M would have been familiar with the

352 Conn. 794        AUGUST, 2025                795

State *v.* Evans

defendant's facial features and other characteristics as they appeared in the photograph.

Furthermore, there was evidence in the record to support the trial court's finding that the defendant's appearance had changed in the six years between the murder and the trial, and the quality of the photograph from which M identified the defendant also favored the admissibility of M's testimony.

In addition, the trial court provided two cautionary instructions to the jury following the admission of M's testimony regarding his identification of the defendant, clarifying that it was ultimately the jury's role to determine whether the defendant was the individual who appeared in the photograph and the surveillance video footage from which the photograph was taken.

The trial court properly denied in part the defendant's motion to suppress the cell site location information (CSLI) that the police had acquired after obtaining the search warrant.

The facts alleged in the affidavit submitted in support of the search warrant, together with the reasonable inferences that could be drawn therefrom, established probable cause to believe that the location of the defendant's cell phone around the time of the murder would provide evidence of the defendant's participation or lack of participation therein and that this evidence would be revealed in the CSLI requested by the police.

Moreover, the trial court properly found that there was probable cause to obtain CSLI for the three days leading up to the murder, the day of the murder, and the day after the murder, as such information would have assisted in securing the defendant's conviction by connecting the defendant's cell phone with his known movements, by providing evidence of his presence at the crime scene and his flight therefrom, and by providing evidence of any attempt to evade detection or consciousness of guilt.

The trial court, however, should not have permitted the scope of the warrant to extend beyond the day after the murder because it was less probable that the CSLI for any day after the murder would have revealed evidence relevant to the crime or assisted in the defendant's apprehension or conviction, but such error was of no consequence because the state introduced at the defendant's trial CSLI for only the day of the murder and the day after the murder.

(*Two justices concurring separately in one opinion*)

Argued May 16—officially released August 12, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder, carrying a pistol without a permit, and criminal possession of a firearm, brought to the

State *v.* Evans

Superior Court in the judicial district of Fairfield, where the court, *Prescott, J.*, denied in part the defendant's motion to suppress certain evidence; thereafter, the charges of murder and carrying a pistol without a permit were tried to the jury before *Prescott, J.*; verdict of guilty; subsequently, the state entered a nolle prosequi as to the charge of criminal possession of a firearm; thereafter, the court, *Prescott, J.*, rendered judgment in accordance with the verdict, and the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, was *Joseph Corradino*, state's attorney, for the appellee (state).

*Opinion*

DANNEHY, J. The defendant, Richard Evans, appeals[1] from the trial court's judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a). The defendant claims that the trial court erred (1) in admitting a lay witness' testimony identifying him in a still photograph taken from a surveillance video, and (2) in denying, in part, his motion to suppress cell site location information (CSLI) that the police had acquired after obtaining a search warrant for those records. We affirm the judgment of the trial court.

I

In 2017, the defendant owned and operated a small moving business based in Connecticut. The business consisted of a single moving truck, which he leased

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

State *v.* Evans

from Joyce Moving and Storage. As the owner and oper-
ator, the defendant was responsible for hiring his own
movers to assist him with various jobs. These moving
assignments often required him and his movers to travel
across the country.

During the last week of June, 2017, the defendant
employed Reginald May (Reginald), a longtime friend
of the defendant, and another friend, Soccus Hender-
son, to help move a client from Mosely, Virginia, to
Spanish Court, Alabama. That job was scheduled to
begin on June 27, 2017, and to conclude no later than
July 1, 2017. On June 28, 2017, while at the jobsite in
Virginia, the defendant and Reginald got into an argu-
ment over money. This argument prompted Reginald
to call his brother, John May (May), who at that time
lived in Fredericksburg, Virgina, to pick him up. When
May arrived at the jobsite to pick up his brother, the
defendant and Reginald engaged in a physical alterca-
tion. After the fight was over, May went to talk to the
defendant, who told May that Reginald owed him
money. May and Reginald soon left the jobsite, and May
took Reginald to a bus station in Washington, D.C.,
where Reginald took a bus home to Connecticut.

The defendant and Henderson completed the delivery
to Alabama on June 30, 2017. They then drove the mov-
ing truck back to Connecticut, arriving in Bridgeport
around 3:20 a.m. on July 2, 2017, and proceeded to the
defendant's residence. Once there, the defendant left
Henderson and drove off in his Cadillac Escalade.[2]

Meanwhile, Reginald and his girlfriend, Cherry Wil-
liams,[3] were watching television and smoking marijuana
inside their shared apartment on Alice Street in Bridge-

_____

[2] At that time, Henderson was living with the defendant.

[3] Although the court transcript identifies Williams' first name as "Sherry,"
her signature on a photo that she signed when identifying the defendant in
the surveillance footage depicts her name as "Cherry."

State *v.* Evans

port. While sitting in their apartment, the alarm in Reginald's car sounded multiple times, causing Reginald to leave the apartment to check on his car.[4] Shortly after Reginald went outside, Williams heard multiple gunshots and then heard Reginald calling her name. Williams looked out the window, saw Reginald lying on the ground, and immediately dialed 911.

Police officers quickly arrived at the scene, and Reginald was taken to the hospital. Reginald subsequently died from a gunshot wound that had entered the right side of his back.

The police began an investigation of the incident, which involved, among other things, obtaining surveillance footage from around Bridgeport. Among the video footage obtained was footage from approximately 4:17 a.m. on July 2, 2017, of a large, dark SUV, consistent with the defendant's vehicle, circling Reginald's apartment building and eventually parking on Alice Street. The footage also showed a male subject wearing a hooded sweatshirt exiting the driver's side of the SUV and walking down the street toward Reginald's apartment building, eventually entering the parking lot at Reginald and Williams' apartment. The man later returned to the SUV at approximately 4:21 a.m.

The police showed both May and Williams a still image taken from the video footage of the individual who had exited from the SUV and walked down the street. Both May and Williams identified the person in the still image as the defendant.

On July 13, 2017, Joseph Milone, a professor at Southern Connecticut State University and a part-time park ranger for the city of New Haven, discovered a firearm

---

[4] Reginald owned a silver Cadillac, which he had received from his father. Months before the murder, the defendant assisted Reginald in moving the car from North Carolina to Connecticut. Reginald's vehicle had an alarm that was triggered when somebody physically touched the car.

State *v.* Evans

and an extended magazine at the base of a waterfall at the West Rock Nature Center on the border of New Haven and Hamden. The Hamden police seized the firearm and sent it to the state forensic science laboratory. Lab personnel test fired the firearm and submitted the results to the National Integrated Ballistic Information Network[5] so that law enforcement personnel around the country would be alerted when a potential link existed between that firearm and any outstanding crimes. The Bridgeport police received a notification from that system that a firearm in possession of the Hamden police may be connected with evidence found at the murder scene. On August 24, 2017, a detective with the Bridgeport Police Department went to the Hamden Police Department and took possession of the firearm.

The firearm, the shell casings recovered from the crime scene,[6] the bullet removed from Reginald's body, and other ballistic evidence seized from the crime scene were submitted to Marshall Robinson, a firearm and toolmark examiner, for analysis. Robinson identified the firearm as a Glock semiautomatic gun, chambered to fire nine millimeter Luger cartridges. Robinson determined that each of the shell casings recovered from around the crime scene had been fired from the same firearm and concluded, to a reasonable degree of scientific certainty, that they had been discharged from the Glock firearm that had been submitted to him for exami-

_____

[5] The National Integrated Ballistic Information Network is "a nationwide investigative system operated by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives that tracks firearms by the 'microscopic marks that are left on bullets and fired cartridge cases.' " *State* v. *Patterson*, 344 Conn. 281, 288 n.13, 278 A.3d 1044 (2022).

[6] During their investigation of the crime scene, officers discovered bullet holes in the fence separating the parking lot on Alice Street where Reginald was killed from the rear yard of a parcel on Wheeler Avenue, resulting in the discovery of a secondary crime scene. The police found eight nine millimeter Luger shell casings in that secondary location.

State *v.* Evans

nation. As for the bullet removed from Reginald's body, Robinson identified it as a nine millimeter full metal jacketed round that was capable of having been fired from the same type of firearm as the Glock in question. Due to insufficient markings on the bullet, however, he was unable to conclusively link it to a specific firearm.

During the investigation, the police also obtained a warrant for the defendant's cell phone records from the defendant's cell phone carrier. Special Agent Elizabeth Wheeler of the Federal Bureau of Investigation testified, based on her review of those records, that the defendant's cell phone connected to various cell towers in the early morning hours of July 2 and on July 3, 2017. She identified eight phone calls occurring between 3:20 and 4:47 a.m. on July 2, 2017. The various connections were consistent with the defendant's phone traveling south from his home beginning around 3:47 a.m., toward Reginald's apartment, and then traveling north, back to his home, connecting with a particular sector of a cell tower that included his home at 4:30 a.m. The following day, July 3, 2017, the defendant's cell phone connected with various towers between 5:39 and 6:12 a.m., consistent with traveling northbound on the Merritt Parkway, ultimately connecting to a cell tower at 5:47 a.m. near West Rock Ridge State Park—the area adjacent to where the park ranger discovered the firearm.

The defendant was later arrested and charged with murder and carrying a pistol without a permit.[7] A jury found him guilty of both offenses, and the court sentenced him to a total effective sentence of sixty years of incarceration. This appeal followed.

II

The defendant claims that the trial court abused its discretion in admitting evidence of May's identification

[7] The defendant also was charged with criminal possession of a firearm in violation of General Statutes (Rev. to 2017) § 53a-217 (a). The state subsequently entered a nolle prosequi with respect to this charge.

State *v.* Evans

of the defendant from a still photograph taken from surveillance footage around the time of the shooting. The defendant argues that May was not at the crime scene and had seen the defendant only one time prior to identifying him in the photograph. The defendant contends that May lacked the requisite familiarity with him to warrant the admission of May's identification testimony. We disagree.

The following additional facts and procedural history are relevant to the defendant's claim. On the second day of trial, May testified that, on June 28, 2017, his brother, Reginald, contacted him to pick him up from a jobsite in Virginia. After arriving at the jobsite, May observed his brother and the defendant engage in a physical altercation. During the fight, May stood nearby, positioning himself in front of two other men who were present, to ensure that they did not join in. May testified that, toward the end of the altercation, the defendant said to Reginald, "I got you; I got you, Reggie . . . ." May further stated that, after the fight was over, he followed the defendant "because [May] didn't know what [the defendant] was going to do." Specifically, May followed the defendant into the street and had a conversation with him, during which time May asked the defendant why he and Reginald had been fighting. The defendant told May that Reginald "owe[d] [him] money." When asked by the prosecutor how long he was at the jobsite, May estimated that he was there for thirty to forty-five minutes before leaving with his brother.

During May's testimony at trial, the prosecutor asked him if "anybody on that moving job [was] present . . . in the courtroom [that day]." May looked around the courtroom and initially did not recognize the defendant, stating, "I mean, I don't see Richard. He was there." He then followed up this initial response by stating,

State *v.* Evans

"Richard." When asked to point out the person to whom he referred, he identified the defendant.

Prior to introducing any pretrial identification evidence, the prosecutor asked the court to excuse the jury. The prosecutor noted that he intended to introduce evidence that May previously identified the defendant from a still photograph that the police had shown him from video surveillance footage.[8] The court proceeded to let the prosecutor lay a foundation for its admission, and, in doing so, the prosecutor elicited testimony from May that he had given a statement to the police on August 10, 2017, that the police had shown him a still photograph from the video surveillance footage, and that he had identified the defendant as the person in that photograph.[9] May further testified that he had never met the defendant before picking up his brother in Virginia at the jobsite on June 28, 2017, but that he was at the jobsite that day for "[m]aybe forty minutes." The prosecutor confirmed with May that he had spoken with the defendant that day, had witnessed the altercation between the defendant and Reginald, and had clearly seen the defendant, as it had been daytime at the jobsite and the defendant had not been wearing anything that obscured his face. When the prosecutor asked May whether the defendant's appearance had changed since he last saw the defendant at the jobsite in 2017, May stated, "I guess. I mean, you know, I guess, yeah."

The parties then made their arguments regarding the admissibility of the identification. After making findings

---

[8] The defendant previously had filed a motion in limine seeking to preclude any testimony identifying him as the person in the surveillance video or photographs. At a pretrial hearing, the parties agreed with the trial court that it would be more appropriate to address the defendant's motion during the trial, given the fact intensive nature of the inquiry.

[9] During the August 10, 2017 meeting, the police also showed May a sequential photographic array that included a photo of the defendant. After reviewing the array, May positively identified the defendant as the individual who fought with Reginald on June 30, 2017.

State *v.* Evans

regarding the various factors set forth in this court's decision in *State* v. *Gore*, 342 Conn. 129, 148, 269 A.3d 1 (2022), which established the requirements for the admission of lay opinion testimony relating to the identification of persons depicted in surveillance video or photographs, the court found that May was better positioned to make a reliable identification than the jury and, therefore, concluded that May could testify as to his identification of the defendant.[10] The jury was then brought back into the courtroom, and the prosecutor proceeded to question May about his identification of the defendant from the surveillance footage. It is the admission of this identification that the defendant challenges on appeal.

Whether a trial court properly admits a lay witness' opinion testimony identifying a defendant from a surveillance photograph or video is an evidentiary issue that we review for an abuse of discretion. See, e.g., id., 149. "[I]n determining whether there has been an abuse of discretion, every reasonable presumption [is] made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . . [A]buse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citations omitted; internal quotation marks omitted.)

_____

[10] In *Gore*, we amended § 7-3 (a) of the Connecticut Code of Evidence to incorporate an exception to the ultimate issue rule for opinion testimony that relates to the identification of criminal defendants and other persons depicted in surveillance video or photographs. *State* v. *Gore*, supra, 342 Conn. 133. Our Code of Evidence now reflects that change. See Conn. Code Evid. § 7-3 (a) ("[t]estimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that . . . (2) a lay witness may give an opinion that embraces an ultimate issue identifying any person in video recordings or photographs, if such testimony meets the standards for the admissibility of lay witness opinion testimony in Section 7-1"). The standard we adopted in *Gore* is the same whether the witness is called by the state or the defendant.

*State* v. *Jacobson*, 283 Conn. 618, 626–27, 930 A.2d 628 (2007). Challenges to a trial court's factual findings that form the basis for its evidentiary decisions are reviewed for clear error. E.g., *State* v. *Samuel U.*, 348 Conn. 304, 318, 303 A.3d 1175 (2023). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire [record] is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id.

In *Gore*, we held that lay "opinion testimony that relates to the identification of persons depicted in surveillance video or photographs" is admissible so long as that testimony meets the requirements of § 7-1 of the Connecticut Code of Evidence. *State* v. *Gore*, supra, 342 Conn. 148. Lay witness opinion testimony is admissible under § 7-1 if it is "rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." Conn. Code Evid. § 7-1. For testimony identifying a defendant in surveillance video or photographs to be "helpful" under § 7-1, there must be "some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury." (Internal quotation marks omitted.) *State* v. *Gore*, supra, 150; see also *State* v. *Davis*, 344 Conn. 122, 142, 277 A.3d 1234 (2022); *State* v. *Bruny*, 342 Conn. 169, 181, 269 A.3d 38 (2022).

In assessing whether a witness is more likely than the jury to correctly identify the defendant from a photograph or video, we have directed our courts to consider the totality of the circumstances. E.g., *State* v. *Gore*, supra, 342 Conn. 150. To guide courts in that analysis, we identified four nonexhaustive factors to consider: "(1) the witness' general level of familiarity with the

State *v.* Evans

defendant's appearance . . . (2) the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken . . . (3) a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or the subject's use of a disguise in the surveillance footage . . . and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage." (Citations omitted.) Id., 151. "[B]ecause we evaluate the factors under the totality of the circumstances, the failure to satisfy a single factor is not fatal" to the admissibility of the identification. *State* v. *Bruny*, supra, 342 Conn. 184. Furthermore, depending on the facts of a particular case, other factors may be relevant to the inquiry.

The defendant claims that the trial court abused its discretion in admitting May's identification of him as the person in the still photograph. The defendant focuses his briefing almost exclusively on the general familiarity factor set forth in *Gore*, making only passing arguments related to the other factors. Nonetheless, we consider the trial court's conclusions as to each of the factors in evaluating whether it properly exercised its discretion in admitting May's identification.

We begin with the general familiarity factor. In order for the witness' general familiarity with the defendant's appearance to weigh in favor of admitting evidence of the witness' identification of the defendant, "the proponent of the testimony [must] demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant." *State* v. *Gore*, supra, 342 Conn. 159. In making that determination, courts consider the "particular, relevant circumstances, including, but not limited to, the frequency, number and duration of any individual prior contacts; the duration of the entire course of contacts and the length of time

State *v.* Evans

since the contacts; the relevant viewing conditions; and the nature of the relationship between the witness and the defendant, if any." Id.

The defendant claims that May's single encounter with him lacked the requisite familiarity required by *Gore.* He maintains that this court was critical of decisions adopting an unduly low threshold for witness familiarity, particularly those in which the witness had seen the defendant only once. The state, on the other hand, contends that the trial court acted well within its discretion in concluding that May had a sufficient level of familiarity with the defendant to support the ultimate conclusion that May would more likely be able to reliably identify the defendant from the still photograph than the jury.

The defendant is correct that, in *Gore*, this court was critical of decisions that set too low a bar for satisfying the general familiarity factor. We explained that, rather than meaningfully assessing whether a witness is familiar with the defendant's appearance, many state and federal courts had reduced the inquiry to simply "ask[ing] whether the witness has ever, even once, seen the defendant prior to identifying him in surveillance video or photographs." Id., 157–58. We expressed particular concern with one case in which a court deemed a witness sufficiently familiar with the defendant despite the fact that the witness had never met the defendant and had only once seen him sleeping on a mutual friend's porch. Id., 154, 159; see also *People* v. *Thompson*, 49 N.E.3d 393, 408 (Ill. 2016). As a result, we adopted a rule that requires a witness to have "more than a minimal degree of familiarity with the defendant" for this factor to weigh in favor of admissibility. *State* v. *Gore*, supra, 342 Conn. 159. Applying that standard, we were confident that such a fleeting and passive observation would not suffice. Id. We specifically acknowledged, however, that we were "eschewing the [bright-line] rule applied by

State *v.* Evans

other jurisdictions in favor of one that relies on trial courts to exercise their discretion to determine whether this factor supports admissibility,'' and we did not foreclose the ''possibility that, under some circumstances, a single encounter [would] be sufficient to satisfy this factor.'' Id.

In the present case, although May had encountered the defendant only once prior to identifying him from a still photograph forty-three days later, the trial court appropriately considered the nature of that encounter in determining that May had more than a minimal degree of familiarity with the defendant. May testified that he was at the jobsite to pick up his brother and remained there for thirty to forty-five minutes, during which time he observed a physical altercation between the defendant and Reginald. May described the physical altercation, stating: ''[T]hey was fighting. They was on the ground. They was hitting each other, and I just was standing there.'' May testified that, after the altercation, he followed the defendant into the street and had a conversation with him. This interaction suggests that May had the opportunity to observe the defendant's gait and posture and to view his face directly.[11] Indeed,

[11] During the trial court's discussion on the record of whether May was better suited to make a reliable identification than the jury, the court noted that the jury had seen the defendant only ''for a limited period of time in this sterile courtroom whereas . . . May would have seen the defendant moving, from various angles, and would have a better understanding of his posture and gait and all of the other factors that would go into it.'' The defendant argues that May was shown a photograph, not a video, and that he did not see the person in the photograph in motion. He argues that neither the parties nor the court asked him if he based his identification on posture or gait and that the trial court's conclusion is speculation and not based on any evidence. We disagree. The defendant's argument appears to misunderstand the court's discussion. The court clearly was indicating that, on the basis of May's encounter with the defendant at the jobsite, May was able to observe the defendant moving around and, therefore, would have more familiarity with the defendant and how he stands and walks than the jurors, who simply observed the defendant in the courtroom. This was fully supported by the evidence in the record and was relevant to the question of whether there was some basis for concluding that May was more likely

State *v.* Evans

May testified that the events took place during daylight hours, that he had a clear view of the defendant, and that the defendant's face was unobstructed.[12]

The trial court found, based on the direct nature of the interaction, that May's focus was heavily on the defendant.[13] This interaction stands in stark contrast to cases in which the witness had no prior interaction with the defendant and had merely observed the defendant in passing on a single occasion. See *State* v. *Gore*, supra, 342 Conn. 154, 159 (criticizing Illinois Supreme Court's general familiarity conclusion in *People* v. *Thompson*, supra, 49 N.E.3d 408). It is also readily distinguishable from circumstances in which a witness had seen the defendant on a few occasions, but the record lacked any information regarding the duration or nature of

_____

than the jury to correctly identify the defendant from the photograph.

[12] In the defendant's brief, he relies on the science discussed in our decision in *State* v. *Guilbert*, 306 Conn. 218, 234–52, 49 A.3d 705 (2012), which addressed the propriety of presenting certain expert testimony on the issue of eyewitness identification, to argue that May's identification was unreliable. He recognizes in another portion of his brief, however, that the present case did not involve an eyewitness identification but a nonpercipient witness' identification, and that "[a] nonpercipient witness is unlike a percipient eyewitness." We are therefore cautious to impute, without qualification, the science and rationale discussed in *Guilbert*, which was in relation to eyewitness identifications, to nonpercipient witness identifications without clearer record evidence that the same science and rationale apply under these circumstances.

[13] In assessing the general familiarity factor, the trial court stated that, considering May's observation of a physical altercation between the defendant and Reginald, "I think that . . . May's focus and attention would have been very heavily on [the defendant] . . . ." The defendant contends that this was clearly erroneous because May testified that he stood in front of the other persons present while the defendant and Reginald fought. The defendant's argument is not persuasive. Contrary to the defendant's assertion, it was reasonable for the trial court to infer that May focused on the two participants of the fight while standing between them and the other persons present. May expressly testified that he observed the physical altercation between the defendant and Reginald. What is more, May testified that he had followed the defendant into the street and had a conversation with him, during which time May asked the defendant why he and Reginald had been fighting.

State *v.* Evans

those encounters or the conditions under which the defendant was viewed. See, e.g., *State* v. *Bruny*, supra, 342 Conn. 183–84 (concluding that witness who had seen defendant five or six times did not have general familiarity with defendant because, inter alia, record was lacking on length and nature of encounters and more than one and one-half years had passed between when witness last saw defendant and when she first saw surveillance footage). On the basis of the trial court's findings of fact, which were supported by evidence in the record, and its consideration of the factors we expressly recognized in *Gore* as relevant to the familiarity analysis, we cannot conclude that the trial court's determination that May was generally familiar with the defendant was "so arbitrar[y] as to vitiate logic, or . . . [was] based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Jacobson*, supra, 283 Conn. 627. We are satisfied that the nature of May's encounter and interaction with the defendant gave May more than a minimal degree of familiarity with the defendant, which weighs in favor of admitting testimony of May's identification of the defendant.

The second factor—May's familiarity with the defendant's appearance at the time the surveillance footage was recorded—also weighs in favor of admission. The still image shown to May was taken from footage captured in the early morning hours of July 2, 2017, just four days after May had seen and spoken with the defendant in person. Given this close temporal proximity, May would have been familiar with the defendant's facial features and other identifying characteristics as they appeared in the surveillance photograph. See, e.g., *State* v. *Bruny*, supra, 342 Conn. 184.

The third factor—whether the defendant's appearance had changed in the six years between the time the surveillance photograph was taken and the time of trial—is a closer question. As the trial court appropri-

State *v.* Evans

ately noted, the record contains limited evidence regarding the defendant's appearance in 2017. That said, the record is not entirely silent on the matter.

To start, the prosecutor asked May whether he recognized anyone in the courtroom who had been present at the June 28, 2017 moving job when he witnessed the altercation between his brother, Reginald, and the defendant. In response, the trial court observed that May "looked around the courtroom a couple times and, at least initially, did not recognize the defendant as the person who was involved in [the] altercation with [Reginald]." May then apparently settled his view on the defendant and uttered the defendant's first name. The prosecutor then asked May to point to the individual and to describe what he was wearing. After May did so, the prosecutor noted for the record that "the witness has identified the defendant . . . ." The prosecutor subsequently asked May whether the defendant's appearance had changed between 2017 and the time of trial, to which May responded, "I guess. I mean, you know, I guess, yeah." Although this response was not emphatic, it showed that May perceived some change in the defendant's appearance. The trial court found May's initial hesitation in identifying the defendant significant and that it was highly suggestive of a change in the defendant's appearance over the preceding six years.

The defendant argues that "[t]he [trial] court speculated about why May had looked around" and that its finding of a changed appearance was unsupported by the evidence. We disagree that the finding of changed appearance was based on speculation and conclude that there was sufficient evidence in the record to support it. First, the trial court observed May looking around the courtroom to determine whether he saw anyone from the moving job, as well as May's delay in concluding that the defendant was, in fact, one of the persons

State *v.* Evans

present at the jobsite. Although there may be other inferences that can be drawn from May's initial hesitation in identifying the defendant, a trial court is not engaged in speculation merely because other inferences could be drawn from the same facts. See, e.g., *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007) (explaining that fact finder is entitled to weigh evidence, assess credibility based on witness' conduct, demeanor and attitude, and draw reasonable inferences therefrom). Second, although not emphatic in his response, May testified that the defendant's appearance had changed. The trial court was able to observe May's demeanor and manner during this time and to evaluate his credibility. See, e.g., *State* v. *Patrick M.*, 344 Conn. 565, 576, 280 A.3d 461 (2022) ("[I]t is well established that [w]e may not substitute our judgment for that of the [finder of fact] when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the [finder] of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony." (Internal quotation marks omitted.)). Finally, the trial court considered the passage of time from the day of the altercation to the trial. On the basis of this record, we cannot conclude that the trial court abused its discretion in determining that the defendant's appearance had changed over the past six years.

As to the fourth factor, the quality of the photograph in question, it clearly falls within a range that favors the admissibility of May's testimony. Indeed, the photograph in the present case is "[neither] so unmistakably clear [nor] so hopelessly obscure that the witness is no [better suited] than the jury to make the identification." (Internal quotation marks omitted.) *State* v. *Bruny*, supra, 342 Conn. 185.

Lastly, we note that, following the admission of May's identification of the defendant at trial, the trial court

State *v.* Evans

gave not only one but two cautionary instructions to the jury. See *State* v. *Gore*, supra, 342 Conn. 163 (explaining that trial courts may exercise discretion and "provide a cautionary jury instruction" regarding reliability of identification). First, following the admission of May's testimony identifying the defendant from the still photograph, the trial court informed the jurors that it was "ultimately . . . [their] role to decide whether . . . that is the defendant [who] is depicted in that video. You certainly can consider the testimony of . . . May in assessing both the reliability of his identification of the person in the video and also use your own powers of observation of the defendant in reviewing the video and the [still photograph] as well. It's ultimately your decision to decide whether . . . that is, indeed, the defendant." In its final charge, the trial court again explained to the jury that "[i]t is for you to determine whether the person in the [still photograph] is the defendant."

In the present case, the trial court carefully and thoughtfully followed the law by applying the relevant factors articulated in *Gore* and raised by the parties. In addition, the court exercised its discretion in providing two cautionary instructions to the jury. On the record before us, we cannot conclude that the trial court abused its discretion in allowing May to testify regarding his identification of the defendant from the still photograph.

We note, finally, that the four factors that this court identified in *Gore*—and applied in the present case— are not exhaustive. The standard we have adopted is a totality of the circumstances test, and the four factors discussed in *Gore* may not capture the full range of considerations relevant in every case. Other factors may well be pertinent, depending on the context, and courts should remain attentive to them and make a record for them, particularly when raised by the parties, in

State *v.* Evans

determining whether there is some basis for concluding that the witness is more likely than the jury to correctly identify the defendant from the applicable photograph or video.[14]

## III

The defendant next claims that the trial court erred by denying, in part, his motion to suppress CSLI records that the police acquired after obtaining a search warrant for those records. We disagree.

On July 20, 2017, the Bridgeport police sought and obtained a search warrant for cell phone records relating to the defendant's cell phone number. The following information was requested: "TELEPHONE RECORDS, BASIC SUBSCRIBER INFORMATION and CALL-IDENTIFYING INFORMATION (incoming, outgoing, numbers dialed, text messaging) for cellular phone number 203-8xx-xxxx[15] and are requesting the information from June 01, 2017 through 07/20/17. Any information regarding cell site activation, geographical positioning (GPS)

---

[14] For example, in arguing that a lay witness' opinion testimony identifying a defendant from a photograph or video surveillance footage should not be admitted, a defendant may raise the sequencing of any photographic array and still photo identification or any other factor that may be relevant to the determination of whether the witness is, in fact, more likely than the jury to correctly identify the defendant from the photograph. In the present case, although May identified the defendant from a photographic array during the same meeting with the police at which May identified the defendant in the still photo, there is no testimony in the record from the police as to the order in which the photographic array and still photograph were shown to him. There is an implication by the prosecutor in the form of one question that the photographic array came first, but it is not clear if that is a suggestion as to the actual order of display or the order that the prosecutor intended to show the exhibits to May at trial. More important, defense counsel did not argue before the trial court that the procedure used by the police undermined the reliability of May's identification of the defendant in the still photo. Instead, the defendant simply raised in the trial court the four factors specifically enumerated in *Gore*.

[15] In the interest of privacy, we have redacted the defendant's cell phone number throughout this opinion.

State *v.* Evans

or any other information that would be able to pinpoint the cell phone's location during calls is also requested. Any text messaging data is also requested.'' (Footnote added.)

The search warrant affidavit provided, among other things, that detectives responded to Alice Street around 4:27 a.m. on July 2, 2017, for a homicide that occurred in the parking lot of that location. Reginald was transported to the hospital for a gunshot wound to the chest and was later pronounced dead. The affidavit further stated that video surveillance footage captured ''a dark skinned male, thin, having a goatee and beard, wearing a hooded sweatshirt,'' walk into the parking lot on Alice Street at 4:19 a.m. and exit approximately thirty seconds later. Video surveillance footage also captured a dark colored SUV, consistent with the defendant's vehicle, in the area of Alice Street around the time of the crime. Reginald's girlfriend, Williams, and another person, Henderson, identified the person in the surveillance footage as the defendant. Henderson was interviewed by the police and stated that he was with the defendant and Reginald days earlier on a jobsite in Virginia, during which time the defendant and Reginald had engaged in a physical altercation, which led to Reginald's leaving and returning to Connecticut. The affiants averred that, ''[t]hrough investigative measures, detectives learned that the cellular phone number for [the defendant] was given as (203) 8xx-xxxx. This number was listed as the contact number for [the defendant] with [the] Offices of Adult Probation (Bridgeport). . . . Through investigative measures, it was learned that 203-8xx-xxxx is a cellular number with the *Custodian of Records* is *Sprint* . . . . Your affiants believe that [the defendant] communicated using his cellular number . . . and that call records, GPS, and text messaging, will show that he was back in Bridgeport . . . on the morning of [July 2, 2017], among other things, which will greatly assist

State *v.* Evans

in this ongoing homicide investigation and respectfully request this warrant be granted.'' (Emphasis in original.)

Prior to trial, the defendant filed a motion to suppress the CSLI records obtained by the police, arguing that the warrant was not supported by probable cause, was not particularized, and was overbroad. The crux of his argument was that the search warrant affidavit did not establish that the perpetrator actually used a cell phone before, during, or after the crime. He further argued that the scope of the search—from June 1 through July 20, 2017—was overbroad because the warrant primarily focused on one date—July 2, 2017—the date of the shooting.

The state argued that the search warrant affidavit not only sufficiently articulated facts linking the defendant to the shooting but also established a sufficient nexus between the defendant, his cell phone, and the alleged criminal activity. The state pointed out that the affidavit stated that the ''affiants believe[d] that [the defendant] communicated using his cellular number (203-8xx-xxxx) and that call records, GPS, and text messaging, will show that he was back in Bridgeport . . . on the morning of [July 2, 2017], among other things, which will greatly assist in this ongoing homicide investigation . . . .'' It also pointed out that the affidavit stated that the cell phone number had been given to the Office of Adult Probation by the defendant as a contact number. The state argued that it was reasonable for the issuing judge to infer from these facts, as well as from other facts, including that the defendant had been working out of state for a few days prior to the crime, that the defendant had his cell phone on his person before, during, and after the crime. This inference, the state asserted, was especially warranted given the ubiquity of cell phone usage in modern life, as discussed by the United States Supreme Court in cases like *Riley* v. *California*, 573 U.S. 373, 395, 134 S. Ct. 2473, 189 L.

State *v.* Evans

Ed. 2d 430 (2014) and *Carpenter* v. *United States*, 585 U.S. 296, 311, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018).

Following a suppression hearing, the trial court granted in part and denied in part the defendant's motion to suppress. The court disagreed with the defendant that the state failed to establish probable cause that certain cell phone records would produce evidence of the crime. Although it acknowledged that the warrant application did not specifically indicate that any surveillance footage captured, or any eyewitness observed, the perpetrator using a cell phone in the minutes before or after the shooting, and also did not provide a more general statement that the perpetrators of crime typically carry their cell phones with them during the commission of a crime and for some period thereafter, the trial court explained that the issuing court could have reasonably inferred that the perpetrator had a cell phone with him before, during, and after the commission of the offense, given the ubiquity of cell phones in modern society. The trial court ultimately concluded, however, that there was probable cause for records relating to the identity of the subscriber and his location only for the period from June 29 through July 5, 2017. The period began during the defendant's work trip and ended when the police located a car in the defendant's driveway that was consistent in appearance with the vehicle depicted in the surveillance video. The court explained that there was no probable cause to seize CSLI records outside that time period or records that showed the numbers called and received by the designated cell phone number. The court severed the warrant accordingly.

"Both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution prohibit the issuance of a search warrant in the absence of probable cause. . . . Probable cause to search is established if there is probable cause to

State *v.* Evans

believe that (1) . . . the particular items sought to be seized are connected with criminal activity or will assist in a particular . . . conviction . . . and (2) . . . the items sought to be seized will be found in the place to be searched. . . . There is no uniform formula to determine probable cause—it is not readily, or even usefully, reduced to a neat set of legal rules—rather, it turns on the assessment of probabilities in particular factual contexts . . . . Probable cause requires less than proof by a preponderance of the evidence . . . . The task of the issuing [judge] is simply to make a practical, [commonsense] decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'' (Internal quotation marks omitted.) *State* v. *Smith*, 344 Conn. 229, 244–45, 278 A.3d 481 (2022).

In evaluating whether the warrant was predicated on probable cause, the reviewing court may consider ''only the information that was actually before the issuing judge'' at the time he or she signed the warrant. (Internal quotation marks omitted.) *State* v. *Sawyer*, 335 Conn. 29, 38, 225 A.3d 668 (2020). This is generally limited to the information contained within ''the four corners of the affidavit.'' *State* v. *Batts*, 281 Conn. 682, 700, 916 A.2d 788, cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007). Courts review the ''issuance of a warrant with deference to the reasonable inferences that the issuing judge could have and did draw . . . and . . . uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the [judge's] conclusion that probable cause existed.'' (Internal quotation marks omitted.) *State* v. *Smith*, supra, 344 Conn. 245.

''Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's deter-

State *v.* Evans

mination on [that] issue, therefore, is subject to plenary review on appeal.'' (Internal quotation marks omitted.) *State* v. *Buddhu*, 264 Conn. 449, 459, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004).

A

The defendant does not dispute that the state established probable cause to believe that he committed the murder. Instead, he claims that the affidavit failed to establish the requisite nexus between the alleged murder and the CSLI because it did not establish that the defendant actually used or possessed his cell phone before, during, or after the commission of the crime. Without an allegation showing that the defendant likely used his phone in temporal proximity to the murder, he argues that there was no probable cause to support the state's request. We disagree.

It is well known that a search warrant affidavit must establish ''probable cause to believe that . . . the particular items sought to be seized are connected with criminal activity or will assist in a particular . . . conviction'' and that ''the items sought to be seized will be found in the place to be searched.'' (Internal quotation marks omitted.) *State* v. *Smith*, supra, 344 Conn. 244. In the present case, the CSLI records at issue contain information regarding the location of the cell phone itself, not any information stored on the device. See, e.g., *Carpenter* v. *United States*, supra, 585 U.S. 306 (''[t]he case before us involves the [g]overnment's acquisition of wireless carrier [cell site] records revealing *the location* of [*the defendant's*] *cell phone* whenever it made or received calls'' (emphasis added)). Given the ubiquity of cell phone usage in modern society, a person's cell phone location can reasonably be presumed to reflect that person's physical whereabouts. See, e.g., *Riley* v. *California*, supra, 573 U.S. 385 (''mod-

State *v.* Evans

ern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy''); see also, e.g., *State* v. *Smith*, supra, 249 (explaining that United States Supreme Court in *Riley* noted that "nearly [three quarters] of smart phone users report being within five feet of their phones most of the time, with 12 [percent] admitting that they even use their phones in the shower" (internal quotation marks omitted)). As the United States Supreme Court has recognized, because people tend to carry their phones with them everywhere they go, tracking a cell phone's location enables the government to conduct "near perfect surveillance" of a person. *Carpenter* v. *United States*, supra, 311–12.

Given the inextricable connection between people and their cell phones, an affidavit establishing probable cause that a suspect committed a crime and facts that the suspect is known to use or possess a particular cell phone—together with the reasonable inferences that can be drawn from those facts—provides a substantial factual basis for a judge to conclude that there is probable cause to believe that the CSLI for that cell phone will provide evidence connected to the criminal activity. See, e.g., *Commonwealth* v. *Hobbs*, 482 Mass. 538, 547, 125 N.E.3d 59 (2019) ("the location of a suspect's cell phone at the time of the criminal activity provides evidence directly related to his or her participation, or lack thereof, in the criminal activity, and the location of the cell phone at that time can reasonably be expected to be found in the CSLI records requested").

Here, the affidavit established probable cause that the defendant committed the murder and that he was known to use or possess a particular cell phone. The warrant affidavit explained that, "[t]hrough investigative measures, detectives learned that the cellular phone number for [the defendant] was given as (203)

State *v.* Evans

8xx-xxxx. This number was listed as the contact number for [the defendant] with [the Office] of Adult Probation (Bridgeport).'' This fact provided a reasonable basis for the issuing judge to conclude that the defendant used or possessed the cell phone assigned to that number, as probation offices require accurate and up-to-date contact information for monitoring and communication purposes.[16] Although the affidavit did not include a general assertion about the ubiquity of cell phones or that the defendant's cell phone location could reasonably be presumed to reflect the defendant's physical location, based on cell phone use in today's world, as well as established case law from the United States Supreme Court and this court, the issuing judge was well positioned to employ his own common sense to make those inferences. Accordingly, we conclude that the facts in the affidavit, together with the reasonable inferences that could be drawn therefrom, established probable cause[17] that the location of the defendant's cell phone for a reasonable period around the time of the murder would provide evidence of his participation or lack thereof in the criminal activity and that this information would be found in the CSLI data requested. Contrary to the defendant's assertions, in the present

[16] The defendant argues in his brief that he was not on probation in 2017 and questions why the state alleged that he was. He states that his last conviction was in 2000. The affidavit did not provide that the defendant was on probation but, rather, simply that the defendant's cell phone number was listed as his contact number with the Office of Adult Probation (Bridgeport). The defendant did not raise in the trial court any claim of staleness.

[17] The defendant also contends that the affidavit did not sufficiently detail the scientific manner in which cell phones communicate with cell phone towers and generate CSLI. We conclude that this omission did not result in a warrant that lacked probable cause. Although a layperson may not necessarily know the technical terminology or precise process of how that information is generated, the fact that cell phones communicate with cell towers and can establish a user's location is common knowledge. See, e.g., *United States* v. *Batista*, 558 Fed. Appx. 874, 876 (11th Cir. 2014) ("[i]t is common knowledge that cell phones connect wirelessly to a nearby cell phone tower").

State *v.* Evans

case, there was no requirement for the state to provide facts from which a judge could find probable cause that the defendant actually used his cell phone around the time of the criminal activity.[18]

The defendant argues that, because the warrant sought location data only during periods of active phone use (when the phone made or received a call) rather than CSLI, which is automatically and continuously generated, the affidavit needed to establish probable cause that the defendant in fact used the phone during the time of the crime. This argument, however, is based on an incorrect reading of the warrant. Although the warrant does, in part, request "any other information that would be able to pinpoint the cell phone's location during calls," it also seeks "[a]ny information regarding cell site activation," which is a broader request for CSLI beyond periods of active use. But even if the state had requested only what the defendant calls "active" CSLI, as we have explained, the affidavit established probable cause to believe that CSLI data for a reasonable period around the time of the murder would contain evidence of his participation or lack thereof in the criminal activity based in part on the defendant's possession and

_____

[18] We note that a request for CSLI without a direct observation of a suspect's actual use or possession of the cell phone at or around the time of the crime does not raise the same nexus concerns that may exist in other contexts, such as when the police seek to access the contents of a cell phone. See, e.g., *State* v. *Smith*, supra, 344 Conn. 249–50. In cases in which the police seek access to the contents of a cell phone, the absence of a particularized showing risks granting the police broad access to extensive and highly personal information—such as call history, messages, photographs, Internet activity, and application data—without a sufficient connection to the alleged offense. The fourth amendment demands a heightened nexus in that context to guard against exploratory searches. By contrast, CSLI, although still entitled to some degree of constitutional protection because it reveals information about a person's movements and associations, presents a narrower privacy intrusion. Because CSLI does not expose the intimate contents of the phone, the requisite nexus between the phone and the crime is less. See, e.g., *Commonwealth* v. *Hobbs*, supra, 482 Mass. 547–48 n.11.

State *v.* Evans

general use of the cell phone together with the reasonable inferences that can be drawn from those facts (i.e., the ubiquitous nature of cell phone usage). Finally, because active use of a cell phone is a subset of all use, we fail to see how a request for the smaller data set constitutes a greater infringement on the defendant's privacy than would a broader request. Accordingly, the defendant's claim fails.

B

The defendant argues that, even if this court determined that the affidavit established probable cause to search and seize CSLI data, the search warrant was nevertheless overbroad because the affidavit failed to establish the requisite nexus between the murder and the CSLI for the entirety of the seven day period (June 29 through July 5, 2017) for which the trial court found probable cause. He primarily takes issue with the trial court's finding of probable cause for CSLI for July 3, 2017—the day after the murder. The state introduced CSLI at trial from that day, showing that the defendant's cell phone connected to a cell tower near West Rock Ridge State Park, near where a firearm connected to the crime was recovered. The defendant contends that the trial court should have severed the warrant to a period of time "shortly before, during, and after the crime, not . . . the next day."

The state argues that the trial court did not err in severing the warrant to permit CSLI for the period that it did. It contends that the defendant "offers no meaningful argument" as to why suppression of CSLI for the day or days after the crime would be necessary. The state contends that, "[when] probable cause exists to believe that a particular individual committed the crime in question, a fair probability exists that CSLI data in the days and weeks after the crime may assist in the apprehension or conviction of the defendant by leading

State *v.* Evans

the police to areas where evidence may have been disposed.''[19]

In *Carpenter* v. *United States*, supra, 585 U.S. 312–15, the United States Supreme Court recognized that CSLI can reveal personal details of an individual's life, including their movements and associations. In light of these privacy concerns, the court held that ''the [g]overnment must generally obtain a warrant supported by probable cause'' before acquiring CSLI. Id., 316. Since *Carpenter*, this court has been cognizant of the sensitive nature of CSLI. In *State* v. *Tyus*, 342 Conn. 784, 272 A.3d 132 (2022), for example, we assumed without deciding that the collection of CSLI for a period of three days, which was less time than the seven day period in *Carpenter*, was nonetheless a search given the sensitive nature of that information. See id., 803–804 and n.12. We noted that ''[a]llowing CSLI collection for a period of three days, in the absence of compelling reasons or exigent circumstances, may not adequately alleviate'' the privacy concerns articulated in *Carpenter*. Id., 803 n.12. Given these privacy concerns, courts must ensure that the breadth of a warrant is justified by the breadth of the probable cause.

We acknowledge that defining the permissible temporal parameters of CSLI searches can be a difficult task and is an evolving issue in fourth amendment jurisprudence. See, e.g., *United States* v. *Disla Ramos*, Docket No. 22-CR-431 (LJL), 2022 WL 17830637, *11 (S.D.N.Y. December 21, 2022) (''[thoughtful] and competent judges

_____

[19] The state notes in a footnote of its brief that it disagrees with the trial court's conclusion that there was probable cause for the CSLI only for the period from June 29 through July 5, 2017. It contends that the period of time it requested in the warrant—June 1 to July 20, 2017—was supported by probable cause. Nevertheless, the state notes that, because it indicated before the trial court that it intended to offer CSLI for only July 2 and 3, 2017, it does not challenge the trial court's decision because ''no live controversy exists as to whether any additional information should have also been admissible . . . .''

State *v.* Evans

might disagree on where to draw the line'' for scope of warrant for CSLI (internal quotation marks omitted)); *Commonwealth* v. *Hobbs*, supra, 482 Mass. 549 (''[w]e recognize . . . that defining the permissible parameters of time for CSLI searches that are justified by probable cause is difficult''). Courts, however, are particularly well suited to undertake that fact intensive inquiry, resolving questions of probable cause based on the particular facts of a given case. See, e.g., *State* v. *Holley*, 324 Conn. 344, 352, 152 A.3d 532 (2016) (issuing judges must assess '' 'all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place' '').

We conclude that the trial court properly found that there was probable cause for CSLI for the period from June 29 to July 3, 2017, but not for the days after that period. The affidavit established that the defendant was in Virginia on June 28, 2017, just days prior to the murder, during which time he and Reginald engaged in a physical altercation. CSLI for the three days leading up to the murder would have revealed pertinent evidence, including that the defendant traveled back to Connecticut and was near Reginald's apartment at the time of the shooting. The location of the defendant's cell phone during those days before the murder also would have assisted in securing the defendant's conviction by connecting the defendant's cell phone with his known movements to further demonstrate that he was the individual in possession of the phone on the night of the crime. CSLI for the day of and the day after the murder— July 2 and 3, 2017, respectively—would have likely provided crucial evidence showing the defendant's presence at the crime scene as well as his flight from that location, including evidence of any attempt to evade detection or consciousness of guilt. Indeed, the affidavit

State *v.* Evans

itself indicated that an SUV similar to the defendant's vehicle was captured on surveillance footage leaving the area of the crime scene with its lights off, suggesting that the suspect was immediately attempting to evade detection. Thus, the defendant's contention that there was no probable cause for CSLI on the day following the murder is unavailing.

For the days beyond July 3, 2017, however, we cannot conclude that there was a sufficient nexus between the murder and the CSLI. The more time that passes after the date of a crime, the less probable it becomes that the CSLI will reveal evidence relevant to the crime or assist in the defendant's apprehension or conviction. Of course, if there were specific assertions in the affidavit that demonstrated that the defendant's movements on those dates were somehow connected to the homicide or that the CSLI would somehow assist in the apprehension or conviction of the defendant, that would be one thing. But there were no such facts contained in the affidavit for those later days. Accordingly, the trial court should have limited the scope of the warrant for CSLI to the period from June 29 through July 3, 2017. Nevertheless, because the state introduced CSLI evidence from only July 2 and July 3, 2017, and the trial court properly concluded that there was probable cause for the CSLI for those dates, the court's error is of no consequence.

The judgment is affirmed.

In this opinion MULLINS, C. J., and D'AURIA and BRIGHT, Js., concurred.

ECKER, J., with whom McDONALD, J., joins, concurring in part and concurring in the judgment. I agree with and join part III of the majority opinion, but I write separately to express my disagreement with part II, in which the majority holds that the trial court properly

State *v.* Evans

admitted evidence that the victim's brother, John May, had identified the defendant, Richard Evans, from a still photograph taken from video surveillance footage recorded around the time of the victim's murder. I concur in the result reached by the majority only because I find that this evidentiary error was harmless.

I

In *State* v. *Gore*, 342 Conn. 129, 132–33, 269 A.3d 1 (2022), this court overruled *State* v. *Finan*, 275 Conn. 60, 881 A.2d 187 (2005), and amended the common-law evidentiary rule codified in § 7-3 (a) of the Connecticut Code of Evidence to permit a lay witness to identify a defendant from video surveillance footage, even though the identification embraces an ultimate issue of fact to be decided by the jury. In doing so, we recognized that a lay witness, unlike an eyewitness to a crime, typically is "on the same footing" as the jury because neither the lay witness nor the jury was present when the crime occurred, and "the video or photographs in evidence are physically present in the courtroom. So is the defendant. The jury is therefore able to compare the defendant with the video or photographs" and to make an identification. *State* v. *Gore*, supra, 150. "Accordingly," we concluded, "as a general rule, that nonpercipient lay opinion testimony identifying a defendant in surveillance video or photographs is admissible only if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury." (Internal quotation marks omitted.) Id.

To determine whether a witness' identification of a defendant from video surveillance footage or photographs is admissible, courts must "evaluate the totality of the circumstances," considering the following four, nonexclusive "factors relevant to determining whether the witness is more likely to correctly identify the defen-

352 Conn. 794 AUGUST, 2025 827

State *v.* Evans

dant than is the jury: (1) the witness' general level of familiarity with the defendant's appearance . . . (2) the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken . . . (3) a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or the subject's use of a disguise in the surveillance footage . . . and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage.'' (Citations omitted.) Id., 150–51.

We took pains to emphasize in *Gore* that this is not a "low standard''; id., 158; or "a mere rubber stamp on the road to admissibility.'' Id., 157. To provide "sufficient protection to criminal defendants against good faith mistaken identifications . . . the proponent of the testimony [must] demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant.'' Id., 159. Although we declined to adopt a bright-line rule and therefore left open "the possibility that, under some circumstances, a single encounter will be sufficient''; id.; we indicated that such a circumstance would be rare by providing "[s]ome illustrative examples of persons who may satisfy this standard . . . .'' Id., 164. Tellingly, those examples identify the typical relationships that produce such familiarity: "friends, longtime acquaintances, neighbors, coworkers, family members, and former classmates.''[1] Id.

[1] To explain the advantageous perspective provided by the kind of familiarity we had in mind in *Gore*, we quoted the following observation made by the United States Court of Appeals for the Fourth Circuit: " '[T]estimony by those who knew defendants over a period of time and in a variety of circumstances offers to the jury a perspective it could not acquire in its limited exposure to defendants. Human features develop in the mind's eye over time. These witnesses had interacted with defendants in a way the jury could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance. Thus, their testimony provided the jury with the opinion of those whose exposure was not limited to three days in a sterile courtroom setting.' " *State* v. *Gore*, supra, 342 Conn. 152, quoting

State *v.* Evans

Today's decision, issued just over three short years later, stands the *Gore* paradigm on its head. The majority concludes that the nonpercipient lay witness in this case, May, generally was familiar with the defendant's appearance under the first *Gore* factor, even though he was not anything like a friend, acquaintance, neighbor, coworker, or former classmate of the defendant. Quite the opposite. May had met the defendant only one time, for thirty to forty-five minutes, approximately one and one-half months before he was asked to identify the defendant from a still photograph derived from video surveillance footage recorded on the night that May's brother was murdered. May's isolated and brief interaction with the defendant was insufficient to provide him with the type of general familiarity necessary to make him more likely than the jury to correctly identify the defendant. See *State* v. *Bruny*, 342 Conn. 169, 183, 269 A.3d 38 (2022) (concluding that witness who "barely qualifie[d] as a casual acquaintance" had "[a] low degree of familiarity with the defendant [that cast] doubt on the reliability of her identification of him in the surveillance footage").

The short and singular nature of May's interaction with the defendant meant that the two men most accurately may be described, not as friends or even acquaintances, but as strangers. Although "the concept of familiarity encompasses a broad range of possibilities"; *State* v. *Gore*, supra, 342 Conn. 162; a "stranger's onetime brief encounter" does not qualify as the type of "familiarity [that] increases the accuracy of identifications" made from video surveillance footage and photographs sufficient to render them admissible. Id., 162–63. As we

*United States* v. *Allen*, 787 F.2d 933, 936 (4th Cir. 1986), vacated on other grounds, 479 U.S. 1077, 107 S. Ct. 1271, 94 L. Ed. 2d 132 (1987); see also *United States* v. *Allen*, supra, 936 ("less than clear" quality of photographs, which provided only "limited glimpses" of individual depicted, rendered testimony of witnesses familiar with defendant more helpful to jury).

State *v.* Evans

explained in *Gore*, "stranger identifications" are less reliable than "familiar identifications" and lead to the risk of good faith misidentifications.[2] Id., 161–62; cf. *State* v. *Guilbert*, 306 Conn. 218, 262, 49 A.3d 705 (2012) (eyewitness to shooting "was not so familiar with the defendant that the risk of misidentification was insignificant"). Indeed, even in the context of identifications made by percipient witnesses to crimes, "scientific developments abundantly [demonstrate] the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of [such] identifications." (Internal quotation marks omitted.) *State* v. *Gore*, supra, 160.

These scientific variables are pertinent to the admissibility of May's identification testimony under the totality of the circumstances.[3] Most worrisome is the particular

[2] Because a good faith misidentification is an honest mistake regarding identity, rather than a lie or prevarication, the majority misses the mark when it observes that "[t]he trial court was able to observe May's demeanor and manner during this time and to evaluate his credibility." Part II of the majority opinion. Scientific data establish that "there is little or no correlation between confidence and accuracy; in other words, an eyewitness' confidence in the accuracy of an identification is not a reliable indicator of the identification's true accuracy." *State* v. *Guilbert*, 306 Conn. 218, 227, 49 A.3d 705 (2012). Stated another way, a witness may genuinely, but mistakenly, believe that his or her identification is accurate and reliable.

[3] I agree with the majority that the *Gore* factors "are not exhaustive" and "may not capture the full range of considerations relevant in every case." Part II of the majority opinion. The sequencing of the photographic array and the still photograph clearly is part of the totality of the circumstances relevant to assessing the admissibility of May's identification of the defendant and, therefore, should have been considered by the trial court, regardless of whether that consideration is viewed through the prism of one of the *Gore* factors or as an additional factor pertinent to this case.

The majority declines to consider these scientific variables "without clearer record evidence that the same science and rationale" applicable to eyewitness identifications also is applicable to familiar identifications. Footnote 12 of the majority opinion. The majority allows the labels (eyewitness versus familiar) to obscure the fact that May's identification of the

State *v.* Evans

methodology used by the police to procure May's identification of the defendant, which cast serious doubt on its reliability. May testified that, on August 10, 2017, forty-three days after his onetime encounter with the defendant, the police showed him a photographic array and asked him to identify the person who had argued with the victim on June 28, 2017. May identified the defendant from the array. Then, the police showed the defendant a still photograph from the video surveillance footage recorded on the night of the victim's murder, July 2, 2017, and asked him if he recognized the person pictured. May identified the person in the still photograph as the defendant. The sequential nature of these two identification procedures plainly risked contaminating May's second identification—the one at issue in this appeal—due to confirmation bias.[4] Cf. R. Wise et

defendant was based on his eyewitness perception of him on a single occasion—the altercation between the victim and the defendant rather than the homicide itself—which makes the two circumstances indistinguishable for purposes of the scientific evidence regarding misidentification. Although May was an eyewitness to an earlier event rather than the homicide itself, like an eyewitness, he lacks the general familiarity necessary to "[render] an identification significantly more reliable than stranger identifications." *State* v. *Gore*, supra, 342 Conn. 162. Because May had only a minimal degree of familiarity with the defendant, his identification of the defendant was not "sufficiently reliable to allay concerns regarding a lack of available procedural protections against a mistaken identification." Id.

[4] Contrary to the majority's assertion, it is clear from the record that May was first shown the photographic array, from which he identified the defendant, and then subsequently was shown the still photograph from the video surveillance footage, from which he identified the defendant. See footnote 14 of the majority opinion. During the hearing on the admissibility of May's identification testimony, the following colloquy occurred:

"[The Prosecutor]: Now, during the time that the statement in Virginia took place, which was on August 10, 2017, did the police show you any photographs?

"[May]: Yes, sir.

"[The Prosecutor]: Did they show you a photo[graphic] array, a series of pictures that they presented?

"[May]: Yes.

"[The Prosecutor]: Okay. *And then* did they show you a still photograph from a video?

"[May]: Hm-hmm." (Emphasis added.)

State *v.* Evans

al., "How To Analyze the Accuracy of Eyewitness Testimony in a Criminal Case," 42 Conn. L. Rev. 435, 462 (2009) ("the influence of confirmation biases (e.g., asking the eyewitness specifically about the suspect while not asking those same questions about [others])" is "likely to cause eyewitness misidentifications" (internal quotation marks omitted)).

By showing May a photograph of the defendant in connection with the altercation on June 28, 2017, and asking him immediately thereafter to identify the person pictured in the still photograph taken from the video surveillance footage recorded on the night of the victim's murder on July 2, 2017, the police made two well-known methodological errors. First, they created a significant risk that May's identification of the second photograph would be influenced by a cognitive bias formed in his mind as part of the first identification he made involving a different event. Cf. S*immons* v. *United States*, 390 U.S. 377, 383–84, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) (risk of misidentification with sequential identifications exists because "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of [any] subsequent . . . identification"). Second, the procedure was tainted by the implied but unmistakable suggestion that the police believed the two incidents were connected and that the person involved in the altercation with the victim on June 28, 2017, the defendant, was a suspect in the victim's murder four days later. See *State* v. *Marquez*, 291 Conn. 122, 143, 967 A.2d 56 (risk of misidentification exists when "the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect"), cert.

May's testimony thus plainly establishes that he was first shown the photographic array "[a]nd then" the still photograph.

State *v.* Evans

denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

May's identification of the defendant also was undermined by the lengthy passage of time, forty-three days, between the one time he saw the defendant and the date on which he was asked to identify the defendant from a photographic array and still photograph. As we previously have recognized, "a person's memory diminishes rapidly over a period of hours rather than days or weeks . . . ." (Footnotes omitted.) *State* v. *Guilbert*, supra, 306 Conn. 238. The reality of memory decay is accepted in the scientific community and recognized in our case law.[5] See, e.g., *State* v. *Bruny*, supra, 342 Conn. 183–84 (witness who "barely qualifie[d] as a casual acquaintance" lacked general familiarity with defendant, "particularly considering that more than one and one-half years had passed between the last time [the witness had seen] him and the first time she [had] viewed the surveillance footage"); *State* v. *Guilbert*, supra, 239 (recognizing that rapid decay of eyewitness'

_____

[5] "Science has proven that memory is malleable," and "an array of variables can affect and dilute memory and lead to misidentifications." *State* v. *Henderson*, 208 N.J. 208, 247, 27 A.3d 872 (2011). One of those variables is "memory decay," which " 'is irreversible'; memories never improve. . . . A meta-analysis of fifty-three 'facial memory studies' confirmed 'that memory strength will be weaker at longer retention intervals [the amount of time that passes] than at briefer ones.' . . . In other words, the more time that passes, the greater the possibility that a witness' memory of a perpetrator will weaken," and the more unreliable the witness' identification becomes. (Citation omitted.) Id., 267, quoting K. Deffenbacher et al., "Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation," 14 J. Experimental Psychology: Applied 139, 142 (2008); see also *Young* v. *Conway*, 698 F.3d 69, 84 (2d Cir. 2012) ("[R]esearch indicates that the passage of time both degrades correct memories and heightens confidence in incorrect ones. . . . According to studies, even a [one week] delay can cause the typical eyewitness viewing a perpetrator's face that [is] not highly distinctive . . . to have no more than a [50 precent] chance of being correct in his or her lineup identification." (Citations omitted; internal quotation marks omitted.)), cert. denied sub nom. *Unger* v. *Young*, 571 U.S. 1015, 134 S. Ct. 20, 187 L. Ed. 2d 409 (2013).

State *v.* Evans

memory is "widely accepted by scientists"). Given the distorting effect of hindsight and the lengthy lapse of time between May's one and only encounter with the defendant and his identification of the defendant, as well as the flawed methodology used by the police to procure May's identification, I conclude that the first *Gore* factor, the witness' general level of familiarity with the defendant, clearly did not weigh in favor of admissibility.

Despite the foregoing facts, the majority concludes that May had more than a minimal degree of familiarity with the defendant because of the nature of his encounter with the defendant, which involved "directly" observing the defendant engage in a physical altercation with his brother. Text accompanying footnote 11 of the majority opinion. The encounter might have been direct in the sense that May had an unobstructed view of the defendant during some portion of that incident, but there was no evidence that the encounter was a particularly memorable event for May. May did not describe it as memorable; nor did he provide sufficient detail regarding the altercation to infer that it was memorable. According to May and another witness, Soccus Henderson, no one intervened to break up the fight, and no one called the police. Henderson described the fight as "a little altercation" that "was not really a big deal . . . ." There is no evidence that either the victim or the defendant sustained any injuries. In the absence of additional evidence, it is pure speculation to say that the nature of May's interaction with the defendant, which amounted to watching a scuffle between two men, was one that made an impression on May's memory.

The altercation likely took on importance only after the fact, through the lens of hindsight due to the victim's subsequent murder. But, by the time the police asked May to identify the defendant, forty-three days had passed. As discussed previously, the passage of one and

one-half months between May's onetime opportunity to view the defendant and his identification of the defendant from the still photograph cast serious doubt on the reliability of his identification due to the rapid diminishment of memory "over a period of hours rather than days or weeks . . . ." (Footnotes omitted.) *State* v. *Guilbert*, supra, 306 Conn. 238.

The second *Gore* factor also does not favor the admission of May's identification of the defendant. See *State* v. *Gore*, supra, 342 Conn. 151. Indeed, the differences between the present case and *Gore* in this respect could not be starker. The witness in *Gore*, Caron Canty, had known the defendant "for half his life" and considered him to be "his cousin." Id., 165; see id., 136. We found that the state had established that Canty was familiar with the defendant's appearance when the surveillance video was recorded because "he spent several hours with the defendant both on the day of the shooting and the following day. In addition, at the time of the shooting, Canty saw the defendant regularly—he spent time with the defendant on most days. He was familiar with the type of clothing the defendant wore, describing him as favoring Nike outfits." Id., 165; see also *State* v. *Bruny*, supra, 342 Conn. 184 (witnesses saw defendant on day of shooting and, "therefore, were familiar with his appearance at the time that the surveillance footage was taken"); *State* v. *Sumler*, 217 Conn. App. 51, 66–67, 287 A.3d 211 (2022) (second *Gore* factor weighed in favor of admission of witness' testimony because witness saw defendant five days before crimes were committed wearing lanyard similar to that depicted in surveillance video), cert. denied, 346 Conn. 914, 290 A.3d 376 (2023).

May, by contrast, did not see the defendant on the night the victim was murdered, so he was not familiar with the clothing that the defendant was wearing that night or any other distinctive aspects of the defendant's

State *v.* Evans

appearance at the time the surveillance video was recorded. More generally, May had nothing to offer about the type of clothing the defendant typically wore because he did not know the defendant and was unfamiliar with his style of dress or any other idiosyncratic physical attributes that would put him on a different footing from that of the jury to correctly identify the defendant from the photograph. See, e.g., *State* v. *Hamilton*, 352 Conn. 317, 321, 354, 336 A.3d 1188 (2025) (trial court properly admitted witness' photograph of defendant wearing "distinctive red and black Jordan 13 sneakers," which defendant was seen wearing in surveillance videos). Although May saw the defendant "just four days after May had seen and spoken with the defendant in person," proximity in time alone is insufficient to satisfy the second *Gore* factor. Part II of the majority opinion. This *Gore* factor, like the first, is concerned with the witness' *familiarity* with the defendant's appearance, whether it be general or specific, not the recency of the witness' opportunity to view the defendant in relation to the video-recorded event.

As to the third factor, the evidence in the record is manifestly insufficient to establish that there had been "a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial . . . ." (Citation omitted.) *State* v. *Gore*, supra, 342 Conn. 151. During the hearing on the admission of May's identification testimony, the prosecutor asked May whether there "was anybody on that moving job [on June 28, 2017] present here in the courtroom today . . . ." May responded: "I mean, I don't see Richard. He was there. Richard." The prosecutor asked whether the defendant, i.e., Richard, "was there," and May replied, "[y]es, sir." The prosecutor asked May to "point [Richard] out" for the jury, and May then identified the defendant. May clearly struggled to identify the defendant, but the record does not reflect the reason for

State *v.* Evans

his uncertainty, that is, whether the source of May's hesitation was his general lack of familiarity with the defendant's appearance, a change in the defendant's appearance, or some other reason not apparent on the record. Later, after May had described the altercation between the victim and the defendant on June 28, 2017, and his statements to the police and identifications of the defendant on August 10, 2017, the prosecutor asked May whether there had been a change in the defendant's appearance between "the one time you saw him in Virginia," and the trial court added, "[t]o the present . . . ." May responded, "I guess. I mean, you know, I guess, yeah." "I guess" is an exceedingly weak basis to conclude that May, who had seen the defendant once for no more than forty-five minutes, was in a better position than the jury to identify the person in the still photograph of the crime scene.

The trial court candidly acknowledged that there was not "a great deal of facts regarding what [the defendant] looked like in 2017" but made two observations to overcome the deficient record. "First of all, six years have passed. [The defendant] does have quite a bit of gray in his beard, and it's difficult from the surveillance video to see if there's any gray in the [beard of the] person depicted in the video . . . . But . . . a good six years have passed, suggesting that there may have been a change of appearance. [Second] [a]nd, just as [important], [the trial court] note[d] for the record that, when . . . May was first asked to identify anybody in the courtroom [who] was present during this interaction in Virginia, he looked around the courtroom a couple times and, at least initially, did not recognize the defendant as the person who was involved in this altercation with [the victim]. To me, that's highly suggestive that [the defendant's] appearance has changed over the past six years."

The trial court's explanation clearly demonstrates that its finding that the defendant's appearance had changed was not based on evidence but on abject surmise and speculation. See, e.g., *State* v. *Lopez*, 341 Conn. 793, 807–808, 268 A.3d 67 (2022) (trial court's factual finding that airsoft gun was "firearm" as defined by General Statutes § 53a-3 (19) was clearly erroneous because, among other reasons, "[i]n the absence of . . . evidence, it is pure speculation whether the airsoft pellet gun is a toy designed for recreational use . . . or a weapon designed for violence and, therefore, a 'firearm' "). See generally *In re Jacob W.*, 330 Conn. 744, 770, 200 A.3d 1091 (2019) ("[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (internal quotation marks omitted)). There was no evidence that the color of the defendant's beard had changed. The trial court itself confirmed that the still photograph does not reveal whether the person pictured had a beard tinged with gray hair, as the defendant had at the time of trial. This observation is an unequivocal acknowledgment by the finder of fact that the evidence is insufficient to demonstrate a change of physical appearance. Only then did the court move on to speculate that "*there may have been* a change of appearance" based on the mere fact that "a good six years [had] passed" since the time of the incident. This is not a factual finding; it is guesswork. See, e.g., *State* v. *Bemer*, 340 Conn. 804, 812, 266 A.3d 116 (2021) ("[a]t some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation" (internal quotation marks omitted)). Moreover, a finding based on mere possibility ("may have been") does not support a conclusion that the state had fulfilled its burden as the proponent of the evidence to

State *v.* Evans

prove a change in the defendant's appearance. See *State* v. *Gore*, supra, 342 Conn. 165 (third *Gore* factor did not weigh in favor of admission of identification testimony because "the record [did] not reflect whether the defendant's appearance [had] changed between the time the surveillance video was recorded and the time of trial").

It was likewise speculative for the trial court to find that May's hesitancy in identifying the defendant in court was "highly suggestive" that the defendant's appearance had changed. Again, this was not a factual finding based on the evidence; it was a flawed, logical conclusion based on the absence of evidence. The only *fact* noted by the court in support of its ruling was that, "when . . . May was first asked to identify anybody in the courtroom [who] was present during this interaction in Virginia, he looked around the courtroom a couple times and, at least initially, did not recognize the defendant as the person who was involved in this altercation with [the victim]." Based on that fact, the court concluded that May's difficulty was caused by the defendant's changed appearance. But this finding is also pure guesswork. It would be equally plausible, at the very least, to conclude that May hesitated to identify the defendant because he had no recollection of how the defendant looked six years ago. This alternative explanation is especially plausible due to May's lack of general familiarity with the defendant. Of course, there are other reasonable explanations for why May had difficulty identifying the defendant in court; the defendant may have been looking away, the witness may have been nervous, and so forth. The state had the burden of establishing a foundation for the admissibility of May's identification under *Gore*, but it made no effort to create a record explaining the cause of May's hesitation. Nor did it offer any other evidence to show that the defendant's appearance had changed in any meaningful way. Because the trial court was left "to speculate

State *v.* Evans

among equally likely possibilities,'' its factual finding lacks evidentiary support. *State* v. *Lewis*, 303 Conn. 760, 775, 36 A.3d 670 (2012).

Nor can I conclude that May's equivocal response to the prosecutor's question of whether there had been a change in the defendant's appearance was sufficient. May's answer to the prosecutor's question—''I guess. I mean, you know, I guess, yeah''—demonstrates that he was guessing that the answer is ''yeah.'' Although this response, shorn of the accompanying qualifier, can be characterized as an affirmative answer to the prosecutor's question, May's hesitancy, apparent confusion, and vagueness strip it of all reliability. Of equal concern to me is that the prosecutor did not attempt to clarify the basis for May's uncertainty as to whether there had been a change in the defendant's appearance. The prosecutor did not clear up whether May's equivocation arose because, six years on, he had no present memory of the defendant's appearance, or because the defendant was wearing different clothes, or because the defendant was seated rather than standing, or some other inconsequential change that would place May in no better position than the jury to identify the defendant from the still photograph. Given the absence of evidence in the record, the third *Gore* factor, like the first and second, weighs against the admission of May's identification testimony.[6]

Last, I find it troubling that May was not a neutral or uninterested witness—he was the victim's brother. As a relative of the victim, he had an interest in ensuring that his brother's killer was arrested and convicted. We

---

[6] As the majority points out, the fourth *Gore* factor, the quality of the photograph, ''clearly falls within a range that favors admissibility . . . .'' Part II of the majority opinion. This factor alone, however, is insufficient to fulfill the state's obligation of demonstrating that May, as opposed to someone more familiar with the defendant's appearance, was the appropriate witness to identify the defendant.

have not yet addressed whether the bias of a nonpercipi-
ent lay witness factors into the totality of the circum-
stances analysis under the *Gore* factors, although the
Appellate Court has held that "bias concerns the weight
to be afforded to a witness' testimony and not its admis-
sibility." (Emphasis omitted.) *State* v. *Orlando F.*, 233
Conn. App. 1, 23, A.3d (2025). I need not address
the issue in this opinion because, for all of the reasons
I have explained, it is clear to me that May lacked
the requisite level of familiarity with the defendant,
regardless of his relationship with the victim, to aid the
jury in its deliberations.

Having considered the totality of the circumstances,
I conclude that the trial court abused its discretion in
admitting May's identification testimony into evidence
for the jury's consideration. Despite the majority's
attempt to fit the facts of this case within the *Gore*
framework, the plain reality is that the majority's hold-
ing represents an enormous expansion of *Gore* far
beyond its intended parameters. In a single bound, we
have moved from the intimate familiarity gained through
a close relationship over many years to a onetime encoun-
ter with a stranger lasting less than one hour. I sincerely
hope that future cases allow this court to recalculate
the proper boundaries of familiarity under *Gore* and to
return it to its original meaning. As we observed in
*Gore*, the "low standard for general familiarity" that we
criticized and declined to adopt in that case "tends
to favor the prosecution," and the majority's decision
today, unless applied with great caution, will have that
unfortunate effect. *State* v. *Gore*, supra, 342 Conn. 158.
In the meantime, I urge trial courts to exercise their
discretion keeping firmly in mind the principles eluci-
dated in *Gore* and the types of illustrative examples set
forth therein. See id., 164 ("[s]ome illustrative examples
of persons who may satisfy this standard are friends,

longtime acquaintances, neighbors, coworkers, family members, and former classmates'').

II

Although the trial court erred in admitting May's identification of the defendant from the still photograph, I conclude that the evidentiary error was harmless because, on this record, I have "a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Bruny*, supra, 342 Conn. 196. The victim's girlfriend, Cherry Williams, who had known the defendant for a "very long time," since middle school, also identified the defendant as the person depicted in the still photograph. The defendant does not challenge on appeal the propriety of the admission of Williams' identification testimony. Because May's identification of the defendant was cumulative of Williams' testimony, and Williams' identification was the stronger of the two due to her extensive familiarity with the defendant, the erroneous admission of May's identification was unlikely to affect the jury's verdict. See, e.g., *State* v. *Alexander*, 343 Conn. 495, 509–510, 275 A.3d 199 (2022); *State* v. *Tyus*, 342 Conn. 784, 805–807, 272 A.3d 132 (2022); *State* v. *Edwards*, 334 Conn. 688, 713, 224 A.3d 504 (2020).

In addition, cell site location data placed the defendant near the scene of the murder, and the defendant's fingerprints were found in a layer of dust on the victim's vehicle, suggesting that he had touched the victim's vehicle around the time of the murder. Given that it was the activation of the victim's car alarm by someone physically touching the vehicle that lured the victim outside in the early morning hours immediately before the murder, the evidence of the defendant's guilt was compelling. Last, following May's identification of the defendant, the trial court gave the jury a cautionary instruction, informing it that it was "ultimately . . .

State *v.* Evans

your role to decide whether . . . that is the defendant [who] is depicted in that video. You certainly can consider the testimony of . . . May in assessing . . . the reliability of his identification of the person in the video and also [can] use your own powers of observation of the defendant in reviewing the video and the still [photograph] . . . . It's ultimately your decision to decide whether . . . that is, indeed, the defendant." In its final charge, the trial court again explained to the jury that "[i]t is for you to determine whether the person in the [still photograph] is the defendant."[7] These cautionary instructions will not automatically inoculate trial proceedings against the effects of an erroneous evidentiary ruling under *Gore*, but they certainly mitigated the potential for harm under the circumstances of this case. Considering the record as a whole, I am not persuaded that the improper admission of May's identification of the defendant likely impacted the jury's verdict. Because I agree with the majority that the defendant's conviction must be affirmed, I concur in the judgment.

———————————

[7] The trial court instructed the jury in relevant part: "The state has offered testimony from [May and Williams] that the defendant is the person in the still [photograph] taken from [the] surveillance video. It is for you to determine whether the person in the [photograph] is the defendant. In making that decision . . . the factors [that] you may consider include the following: (1) the witness' general level of familiarity with the defendant's appearance, (2) the witness' familiarity with the defendant's appearance at the time that the surveillance video was taken, (3) any change in the defendant's appearance between the time the surveillance video was taken and trial, and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage. You should consider the totality of the circumstances in determining whether [May and Williams] have made an accurate identification of the defendant in the surveillance video or photographs."